163 A.2d 264 (1960)
COMMERCIAL METALS COMPANY, a Delaware corporation, Appellant, Defendant below,
v.
PAN AMERICAN TRADE AND INVESTMENT CORPORATION, a Delaware corporation, American Rail and Steel Co., a Delaware corporation, and Milton E. Canter, Appellees, Plaintiffs below.
Supreme Court of Delaware.
July 26, 1960.
John P. Sinclair of Berl, Potter & Anderson, Wilmington, for appellant.
George T. Coulson of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellees.
SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.
*266 SOUTHERLAND, Chief Justice.
Plaintiff Canter claims that he and the defendant, Commercial Metals Company, entered into an agreement of joint venture, and that Commercial Metals wrongfully excluded him from its consummation. He filed suit for an accounting. Commercial Metals denied the existence of the agreement. The Chancellor found for Canter and directed an accounting. The account was filed, exceptions were ruled on, and Commercial Metals appeals.
Two questions are raised: (1) the correctness of the finding of joint venture; (2) the correctness of certain rulings on the accounting.
The facts are these:
Canter, formerly a practicing attorney in New York City, entered the government service during the Second World War, and from September 1945 to some time in 1946 was with the War Assets Administration. Shortly after leaving that bureau he went into the steel rail business.
Commercial Metals is one of the leading scrap metal dealers in the country. Its business included the purchase, removal and sale of used rail.
In July 1948, Canter talked to Feldman of Commercial Metals about a possible joint venture relating to some rail. Feldman told him it could not be worked out, but wrote Canter a cordial letter, inviting Canter to submit any other deals on which Canter thought that they could work together.
In the same month Canter learned of an opportunity to buy some pipe and 6.48 miles of rail in Camp Gordon Johnson in Carrabelle, Florida. This rail connected with a rail line extending from Carrabelle to Tallahassee.
Canter advised Feldman of the opportunity. Commercial Metals had an inspection of the rails made, and on August 3 authorized Canter to make an offer. In that connection Merritt of Commercial Metals wrote:
"It is understood that if successful in buying any or all of this property, it is to be handled on a joint account basis, each of us sharing equally in expenses, investment, and profit or loss."
The venture was unsuccessful because a higher bid was submitted, and Canter so advised Merritt.
Canter continued to correspond with Commercial Metals about a number of possible deals but nothing came of them.
On October 19, 1948, Canter advised Feldman by telephone that a Mr. Fletcher had an exclusive agency to sell the rail line from Carrabelle to Tallahassee. This line was owned by the Gordon Land Company. Commercial Metals was interested and had an inspection made. A serious difficulty, however, existed. In the sale to the Gordon Land Company the War Assets Administration had imposed a restriction requiring that the purchaser use the rail line on the site. Commercial Metals was not interested in the purchase at any price unless the restriction could be removed. Canter was to attempt to have the restriction removed.
Before this was done Fletcher secured a possible purchaser, Luria Brothers. The sale to them was about to be consummated, but they withdrew.
Thereafter the property was again on the market. Merritt in January authorized an offer of $200,000. Canter replied that another firm had already offered $260,000. He added:
"Thus, it would seem that your offer entirely eliminates the possibility of our working this out together."
Merritt replied and in effect declined to raise his price at the moment, but asked Canter to write him when Canter thought the property could be salvaged (i. e., when the restriction could be removed).
*267 Upon receiving this letter, Canter, according to his testimony, talked with officials at the War Assets Administration, including Mr. Jess Larson, the Administrator, and also talked to Senator Pepper and Congressman Sykes, who had been instrumental in persuading the Administration to impose the restriction. He reported to Feldman, who asked him to keep working on it. He kept working on it, and when he learned that the restriction was about to be lifted he advised Feldman.
Mr. Larson's deposition corroborates Canter's testimony concerning Canter's efforts in the matter.
Canter says that he visited Merritt in Dallas on July 26, 1949, and referred to the removal of the restriction, and asked what was to be done about the rail. Merritt said he didn't know.
On August 4, 1949, the rail was sold at auction at Carrabelle and was purchased by Commercial Metals. When Canter learned of this he called Merritt on the telephone to claim an interest in the purchase, but Merritt denied it. On August 22 formal demand to participate in the venture was made on Commercial Metals by Canter's attorneys, but no reply was received.
Upon these facts the Vice Chancellor held: (1) that there was an express agreement of joint venture initially confined to the rail in Camp Johnson; (2) that, both expressly and impliedly, the agreement was expanded by mutual consent to include the rail line from Carrabelle to Tallahassee. He therefore held that Commercial Metals could not exclude Canter from the venture.
Defendant assails the finding as not warranted by the evidence. It is said that the terms of the venture, so far as concerns the Carrabelle rail transaction, were never agreed on. The Vice Chancellor evidently inferred that the terms of the letter of August 3, 1948, were impliedly incorporated in the subsequent transaction. Feldman had invited Canter to offer deals on a joint basis, and Canter continued to do so after the Camp Johnson rail bid failed. The parties could hardly be expected to repeat the terms of the August 3 letter in all subsequent correspondence. The Vice Chancellor's conclusion is not unreasonable, and we decline to disturb it.
Defendant seeks to build an argument on Canter's failure to write any letters after January 18, 1949. The argument comes to this  that the Vice Chancellor should not have credited Canter's testimony. This contention cannot be made here. The credibility of that testimony was for the trier of facts.
Much is sought to be made of Canter's statement in his letter of January 18 to the effect that the inadequacy of Merritt's price eliminated the possibility of their working the matter out together. It is said that this statement was an abandonment of the venture by Canter.
The argument overlooks Merritt's reply, which kept the whole matter open. Merritt in effect indicated that if a definite date were fixed for lifting the restriction Commercial Metals would reconsider its position.
Canter's testimony that he worked assiduously to have the restriction lifted, and kept Feldman fully advised about the matter, was obviously credited by the Vice Chancellor.
Defendant criticizes some incidental statements in the Vice Chancellor's opinion, but none of these matters is, in our opinion, of any serious moment.
We are of opinion that the evidence, taken in the light most favorable to Canter, supports the Vice Chancellor's finding of joint venture.
The order of October 28, 1959, is affirmed.
Commercial Metals filed an account purporting to show the net profits on the resale *268 of the rails. The Vice Chancellor disallowed certain items claimed by Commercial Metals as deductible from the gross profit, and these rulings are assailed as erroneous.
Items of $4,000 for interest on investment and $8,066 for general overhead were, we think, properly excluded. In effect they represented an attempt by one joint venturer to charge compensation for services in providing capital and in providing the organization to handle the transaction. The general rule is that a coadventurer is not entitled to interest on capital which he is bound to furnish, nor to general overhead costs representing an allocation of cost of rendering services in furtherance of the joint venture. Elliott v. Murphy Timber Co., 117 Or. 387, 244 P. 91, 48 A.L.R. 1043; 30 Am.Jur. "Joint Adventures", § 37, § 41; 40 Am.Jur. "Partnership", § 124. It must be kept in mind that after Commercial Metals had bought the rails Canter, in his letter of August 22, 1949, demanded the right to participate, and declared that he was ready, able and willing to perform his obligations under the contract. Defendant was not entitled to refuse this offer and then saddle Canter with interest and overhead incident to carrying out the venture.
The Vice Chancellor also disallowed a claim for legal expenses of $1,063.07 on the ground that Canter was an attorney, was familiar with the scrap metal business, and was qualified to furnish legal services. With this holding we are compelled to disagree. That Canter was a lawyer was a purely fortuitous circumstance. He did not enter upon the adventure in a professional capacity. The item in our opinion is a proper deduction.
The Vice Chancellor also disallowed an item of $3,500 representing a payment to Abe Fletcher for "services" in connection with the sale. Since Fletcher was the agent of Gordon Land Company and not of the seller the payment, at best, was a pure gratuity and as such not deductible. It was paid to him without the knowledge of his principal. Commercial Metals was under no obligation to pay him anything, since Fletcher could not have enforced payment. He was attempting to serve two masters. In our opinion the item was properly disallowed. Molloy v. Rourke, 83 Conn. 196, 76 A. 517.
Commercial Metals' last objection to the accounting concerns the refusal of the court below to require Canter to account for the profit that Canter made on a resale of 1,000 tons of the Carrabelle rails. The facts are these:
In November 1949, Canter learned of an opportunity to sell 1,000 tons of 60-pound rail. He had apparently contracted to sell it to someone. He called Merritt of Commerical Metals and bargained for the rail. They finally agreed on a price and the purchase was consummated. Canter resold it, evidently at a profit.
There is no doubt that the rail he bought was part of the Carrabelle rail that was the subject of the joint venture. The invoice in evidence shows the sale of 56-60 pound relay rail at a price of $48,657.32. An entry showing the receipt of this amount in November appears on Commercial Metals' books in an account headed "Carrabelle R. R. Job."
Defendant makes two arguments based on this transaction: first, that Canter, knowing that the rail was part of the Carrabelle rail, waived his right to an accounting on the joint venture; and second, that in any event, if Canter insisted on his share of the profit on the sale to him, he should in turn account to defendant for his profit on the resale.
The Vice Chancellor held that Canter's purchase did not constitute a waiver of Canter's claim to enforce the joint venture, and we think that he was right. A waiver is an intentional relinquishment of a known right, and there is no evidence that Canter had any intention to waive *269 his rights under the joint venture. Indeed, it is by no means certain that Canter knew that the rail he was buying was part of the Carrabelle rail, although the circumstances would suggest that he might well have thought so.
But defendant's second point seems to a majority of the Court to be well taken. Under the rulings below Canter is permitted to claim half the net profit incident to the sale from Commercial Metals to him, and all of the profit incident to his own resale. This we think highly inequitable.
The situation of the parties at the time of the transaction was this: Commercial Metals was claiming that no joint venture existed. Consequently it believed that it was dealing with Canter as a stranger in an arm's length bargain. But Canter never acquiesced in that position. His claim was and is that Commercial Metals could not expel him from the venture and that his rights thereunder were unimpaired. This claim he has made good. But if his rights continued unaffected by Commercial Metals' attempted expulsion, his duties as a joint venturer also remained unaffected. Part of the joint venture was the sale of the rails  the realization of the expected profits. When Canter had the opportunity to sell rail of the Carrabelle type it was his duty either to offer the opportunity to Commercial Metals, subject to his claim of joint venture, or else to obtain from Commercial an understanding that the transaction was to be regarded as outside the scope of the venture. He did neither. He now seeks to hold Commercial Metals to an accounting for the profit on the sale to him and to deny his codaventurer an accounting for the profit on the resale.
There is nothing inconsistent in the present position of Commercial Metals. It denied Canter's claim, and litigated the question. Its position, though determined to be erroneous, was not frivolous. It having now been established that a joint venture existed, it is entirely proper for Commercial Metals to insist upon the application of the maxim that he who seeks equity must do equity.
In the view we take of the matter, Canter's knowledge of the source of the rail he bought is quite immaterial. It is enough that he knew that it was of the same kind as the Carrabelle rail, and that it now develops that it was a part of that rail. As such it must be accounted for. The accounting must therefore be adjusted to include Canter's profit on the resale.
Since the amount of Canter's profit has never been disclosed, further discovery must be had. The cause is remanded to the court below with instructions to vacate the final decree of February 2, 1960, and to take such further proceedings as may not be inconsistent with this opinion.
BRAMHALL, Justice (dissenting in part).
I concur with the opinion of the majority except as to one phase of the accounting: the right of defendant to claim as a set-off one-half the net profits incident to the resale by plaintiff of certain rails which were a part of the joint venture and which plaintiff purchased from defendant after defendant had breached the agreement of joint venture. I do not agree, in view of the circumstances under which this transaction arose, that this set-off should be allowed.
Subsequent to the breach of the joint venture agreement, plaintiffs purchased from defendant certain rails for resale to a customer. It later developed that these rails were a part of the rails included in the joint venture. Defendant, in the court below, and before this Court, claimed that one-half the profits from the resale of these rails should be allowed as a set-off in the accounting. The majority have held that it was proper for it to do so.
The record shows that this was an arm's length transaction. The price paid by plaintiff was "high". The transaction was *270 treated by both parties as something separate and apart from the joint venture. Plaintiff testified  and his testimony in this respect was uncontradicted  that up to the time of his appearance upon the witness stand, he had no knowledge that these rails were a part of the joint venture. Counsel for defendant at the trial, after objection to this testimony on the part of plaintiff, specifically conceded that if plaintiff didn't know that the rails were Carrabelle rails, the testimony relating to this transaction was not relevant. The Vice Chancellor made no finding as to plaintiff's knowledge concerning the rails; he "assumed without deciding" that plaintiff was aware, or should have been aware, of the source of the rails which he contracted to purchase from defendant.
As I view this transaction, it is one which must be treated in the same manner in which it was treated by the parties at the time of its completion, that is, an arm's length transaction for the purchase by plaintiff for resale of goods without regard to the joint venture. The record is entirely devoid of any evidence from which an inference can be drawn that either of the parties treated this transaction in any other manner. In view of the position of the parties at the time the transaction was completed, defendant should be estopped from now asserting that the rails were a part of the joint venture.
The reasoning followed by the majority in reaching their conclusion is, in my opinion, directly contrary to the reasoning followed in this opinion relative to certain other items of the accounting, namely, the items of $4,000 for interest and $8,066 for general overhead. As to these items, we said: "Defendant was not entitled to refuse this offer [Plaintiff's offer to perform his obligations under the joint venture] and then saddle Cantor with the interest and overhead incidental to carrying out their venture." Applying the same logic, and, if I may be permitted to do so, paraphrasing the language above quoted, "Defendant was not entitled to repudiate the joint venture and later saddle plaintiff with its claim to one-half the profits which plaintiff may have derived in a transaction which was handled by both parties as an entirely separate transaction."
If, as stated in the majority opinion, plaintiff had a duty to defendant to offer the deal to defendant as a part of the joint venture, in the absence of an understanding between the parties, then defendant was under a corresponding duty to plaintiff to notify plaintiff that the rails were a part of the joint venture and that, in the event that it should later be decided that the parties were engaged in a joint venture, defendant would expect plaintiff to account to defendant for its share of the profits. Defendant's responsibility in that respect was equally as great as that of plaintiff. Not having done so, defendant cannot now claim that the profits that plaintiff may have received from the resale of the rails were a part of the joint venture.
I should deny defendant's claim to a set-off for the profits which plaintiff may have derived from the resale of the rails to a third party.