**PEPSI–COLA BOTTLING COMPANY OF ASBURY PARK, a corporation of the State of New Jersey, and Pepsi-Cola Newburgh Bottling Co., Inc., a corporation of the State of New York, Plaintiffs Below, Appellants,**

v.

**PEPSICO, INC., a corporation of the State of Delaware, Formerly Known as The Pepsi-Cola Company, Defendant Below, Appellee.**

Supreme Court of Delaware.

July 12, 1972.

Reargument Denied Sept. 13, 1972.

E. Norman Veasey and R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, for appellants.

William S. Potter and Charles S. Crompton, Jr. of Potter, Anderson & Corroon, Wilmington, Benjamin Algase, New York City, for appellee.

WOLCOTT, Chief Justice, and CAREY, Justice, and CHRISTIE, Judge, sitting.

WOLCOTT, Chief Justice:

This is an appeal from a final judgment entered by the Vice Chancellor against the plaintiffs, Pepsi-Cola Bottling Company of Asbury Park (hereafter Asbury Park) and Pepsi-Cola Newburgh Bottling Co., Inc. (hereafter Newburgh), and in favor of the defendant, Pepsico, Inc. (formerly The Pepsi-Cola Company, hereafter Pepsi). The plaintiffs appeal.

This consolidated action was instituted by two independent bottlers holding appointments from Pepsi granting the exclusive right to bottle and sell Pepsi-Cola in their defined areas. The action is one for a declaratory judgment that a 1963 increase in the Pepsi-Cola concentrate price violated the terms of the appointments. Also prayed for is an order of specific performance requiring Pepsi to supply the plaintiffs' requirements for concentrate at the price stipulated in their appointments. Plaintiffs also seek an accounting of alleged overpayments made under protest by them since the 1963 increase.

Pepsi interposed six defenses to the complaint, the first two of which are that the parties to this litigation, by their course of conduct over an 18-year period, had amended the concentrate price provisions of the appointments, and that the course of conduct of the parties constituted a binding waiver by the plaintiffs of the price provisions. The Vice Chancellor, in his final judgment, gave judgment for Pepsi for the reasons stated in his Opinion of September 21, 1971, 282 A.2d 643. The final judgment incorporated that Opinion. Each and every prayer for relief in the complaint and the amendments thereto was denied.

We state the facts, which are undisputed, or as found by the Vice Chancellor.

Pepsi is in the business of manufacturing Pepsi-Cola concentrate or Pepsi-Cola syrup which it sells to some 500 bottling plants throughout the country for the purpose of producing and selling to the public bottled Pepsi-Cola. Each bottler has an appointment from Pepsi franchising it as the sole bottler and distributor of the finished Pepsi-Cola product in its defined territory. The price charged for the concentrate or syrup by Pepsi to its bottlers is uniform. Some 125 of the licensed bottlers have appointments which antedate 1951, among which are the two plaintiffs in this litigation. The appointments held by these bottlers contain price provisions which are not contained in appointments issued by Pepsi subsequent to 1951. The particular provisions contained in the plaintiffs' appointments, in controversy in this litigation, are found in Paragraph 10 of each appointment. Paragraph 10 of the appointment issued to Newburgh on October 5, 1945 for a designated area in New York is in the following language:

"That Pepsi-Cola will furnish and sell to the Bottler a unit of sufficient of said secret merchandise, together with sufficient crowns and labels, to make and bottle, with the addition of said plain syrup and carbonated water furnished by the Bottler, Twelve Hundred (1,200) cases of Pepsi-Cola, as aforesaid, for the sum of Three Hundred Fifteen Dollars ($315.00) on a C.O.D. basis, freight to be paid by the Bottler, or freight prepaid, provided the Bottler accompanies his check in advance with order. Said price is based upon costs of materials, ingredients, crowns and labels at the time said price was established, and if higher costs for such materials, ingredients, crowns or labels shall prevail, then said price may be advanced to the extent of such bona fide cost advances."

Paragraph 10 of the Asbury Park appointment, issued June 28, 1948, for a designated area in New Jersey, is in the following language:

"That Pepsi-Cola will furnish and sell to the Bottler a unit of sufficient of said secret merchandise, together with sufficient crowns and labels, to make and bottle, with the addition of said plain syrup and carbonated water furnished by the Bottler, Twelve Hundred (1,200) cases of Pepsi-Cola, as aforesaid, for the basic price of Three Hundred Fifteen Dollars ($315.00), freight prepaid, payment to be made by the Bottler in advance of shipment, provided that if labels are not furnished with any such unit due to use of ACL bottles, the basic price shall be Three Hundred Five Dollars ($305.00). Said basic price is based upon costs of materials, labor and freight at the time said price was established, and if higher costs for such materials, labor and freight shall prevail, then said price may be advanced to the extent of such cost advances."

It is to be noted that each Paragraph 10 of these two appointments is in somewhat different language. The Newburgh appointment provides that the price of concentrate to Newburgh "is based upon costs of materials, ingredients, crowns and labels at the time said price was established", and if such materials, ingredients, crowns and labels advance in cost, then the price to Newburgh may be advanced.

Paragraph 10 of the Asbury Park appointment provides that the price of concentrate "is based upon costs of materials, labor and freight at the time said price was established", and if the costs of such items rise, then the price may be advanced to the extent of such price rise.

In 1939, when the Pepsi-Cola venture was acquired by the stockholders of Loft Incorporated following protracted litigation over the ownership, the new management instituted a sales promotion based upon a bargain appeal to the consumer, that is, selling a larger drink, 12 ounces for 5 cents, in competition with Coca-Cola's 5-

cent 6-ounce drink. The product was advertised to the public as "twice as much for a nickel, too". Under this type of promotion, Pepsi prospered for approximately 20 years.

Following World War II, Pepsi's prosperity began to diminish since its promotional operation could not compete with the heavily advertised competition of its principal competitor, Coca-Cola. In 1950, Pepsi's management embarked upon a different type of promotion based upon extensive advertising by Pepsi, itself. This activity on the part of the parent company* directly benefited the licensed bottlers through increased sales of the finished product.

Commencing in 1946, Pepsi began changing the prices of the units of concentrate, crowns and labels to its bottlers, all of whom at that time had appointments similar to those of the plaintiffs. These price adjustments were made by sending notices to the individual bottlers of the price changes. When the unit price changes first started, despite the fact that all of Pepsi's bottlers had provisions in their appointments similar to Paragraphs 10 of the plaintiffs' appointments, it seems clear that Pepsi made no specific attempt to justify the price changes under the specific items of the price formulae contained in the Paragraphs 10 of the early forms of appointments. As has been pointed out, following 1951 new appointments on occasion were issued to some bottlers without the provisions of Paragraph 10, until, by normal attrition and changes in territories, and for other reasons, at the present time all but approximately 125 of the 500 bottlers are operating under new appointments without comparable Paragraphs 10 in them.

Over the years, various changes in unit prices were made by Pepsi and, prior to the 1963 price change complained of in this lawsuit, no bottler ever objected to or made a complaint that such price changes violated the terms of the appointments. In sending out the notices of the price changes, no distinctions were made by Pepsi among bottlers, regardless of the form of the appointment they held, except in two special cases which are immaterial in this lawsuit.

The various changes in prices were as follows:

In 1946, an increase was made in the per unit price. In the notice it was stated that the increase was made necessary by the substantial rise in price "of materials and other costs". The plaintiff Newburgh received this notice and continued payment for the concentrate at the increased price.

In July, 1947, Pepsi, in an effort to maintain the company's policy of keeping a bargain sales advantage, reduced the price of concentrate.

In November, 1947, a further price reduction in the cost of concentrate was effected by notice, but the size of the unit was increased to permit the bottling of 1800 cases of Pepsi-Cola instead of the former 1200 cases.

In July, 1949, Pepsi noticed its bottlers of an increase in the price of concentrate in the 1800-case unit. This notice was received by both of the plaintiffs in this litigation and neither objected to the price increase resulting from Pepsi's action. This notice also allowed a special credit to bottlers to induce them to make a special sales promotion and advertising of the product. A further effect of this notice was to increase the price of crowns and to eliminate the supplying of labels, both of which were included in the basis of the price set in the Paragraphs 10.

In June, 1950, by notice, Pepsi eliminated the allowance to the bottlers for local advertising costs, and made a flat reduction in the price of concentrate.

In July, 1950, Pepsi notified all of its bottlers that it had discontinued the sale of crowns which, up to then, had been included in the concentrate unit price. This no-

---

* While not actually the parent company of the enterprise, Pepsi is in fact considered as such by its licensed bottlers.

tice did not effect a change in price, although under the provisions of Paragraph 10 of the then appointments the cost of crowns and labels was covered by the unit price. The result would seem to be a net increase in the cost of concentrate.

In 1953, by notice, Pepsi raised the concentrate unit price by $27 per unit. This notice explained the necessity for the increase as due to "the increased manufacturing and shipping cost of our concentrate". As with respect to the other notices of price changes, no objection was made by any bottler.

In November, 1956, by notice, Pepsi made a further increase in the price for concentrate units. In this notice it was stated that, despite rising costs, Pepsi would greatly increase its dollar investment in advertising, sales promotion and other marketing devices to push the product. Specifically, the purpose of this program was stated to be to "implant even more firmly upon the minds of your customers the look and sound of the trademark; the taste and feel of the product". There was no objection to this price increase.

In June, 1958, Pepsi, by notice, informed its bottlers that the 1800-case unit of concentrate was increased to a 2000-case unit, and fixed the price for the new unit. This effected a slight increase in the cost of concentrate. No objection was received from any bottler concerning this change in the unit size and increase in price.

All bottlers thereafter continued to purchase concentrate under the unit price fixed in 1958 until 1963 when, by notice, Pepsi notified all bottlers of a proposed price increase of $80 per concentrate unit. This amount was protested by the Bottlers Association and was negotiated down to an increase of $40 per unit. Thereafter, the plaintiffs purchased concentrate from Pepsi with checks sent under protest of the increase as a violation of Paragraph 10 of their respective appointments.

It will be noted that the series of price notices sent to bottlers had changed the $315.00 per concentrate unit fixed in Paragraph 10 nine times over the years; the case size of the concentrate unit had been changed three times, and the requirement of Pepsi to supply crowns and labels had been eliminated.

The basic argument made by the plaintiffs is that there is no formal bilateral written agreement between the parties modifying the price provisions of Paragraphs 10 of their appointments. They argue that the identical provisions contained in Paragraph 16 of each appointment, to the effect that the written appointment expresses fully the parties' understanding, and that no future changes in the terms shall be valid except when reduced to writing and executed by both sides, are conclusive of the matter since there is no bilateral written agreement of amendment.

We think, however, that the lack of a written amendment is not necessarily conclusive. Bartlett v. Stanchfield, 148 Mass. 394, 19 N.E. 549 (1889), a decision of the Supreme Judicial Court of Massachusetts, we think properly states the rule as follows:

"Attempts of parties to tie up by contract their freedom of dealing with each other are futile. The contract is a fact to be taken into account in interpreting the subsequent conduct of the plaintiff and defendant, no doubt. But it cannot be assumed, as matter of law, that the contract governed all that was done until it was renounced in so many words, because the parties had a right to renounce it in any way, and by any mode of expression, they saw fit. They could substitute a new oral contract by conduct and intimation, as well as by express words."

This decision was cited with approval by this Court in Pan American World Airways v. United Aircraft Corp., 3 Storey 7, 163 A.2d 582, Del.Supr. (1960), although the rule announced in *Stanchfield* was held not to be applicable in the *Pan American* case. See, also, 4 Williston, Contracts, §

623 and Elliott-Lewis Corp. v. York-Shipley, Inc., 372 Pa. 346, 94 A.2d 47 (1953).

 We think, therefore, that a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement. We agree with *Stanchfield* that a written agreement does not necessarily govern all conduct between contracting parties until it is renounced in so many words. The reason for this is that the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit. They may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement. We think the existence of Paragraphs 16 in the plaintiffs' appointments does not prohibit the modification of making of a new agreement by conduct of the parties, despite a prohibition of Paragraphs 18 against any change except by written bilateral agreement.

The prohibition against amendment except by written change may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by the course of conduct of the parties. Congress Factors v. Malden Mills, Inc., 332 F.Supp. 1384 (D.N.J.1971); Taylor v. University National Bank, 263 Md. 59, 282 A.2d 91 (1971), and Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378 (1919).

The plaintiffs, however, strenuously argue that proof of the course of conduct of the parties does not rise to the necessary evidentiary height to justify the finding of the Vice Chancellor. They argue that it is necessary for Pepsi to prove a waiver on their part of their rights under the written appointments and three elements must necessarily be established before the conclusion of waiver may be reached. These elements are (1) a right to be waived; (2) the waiving party must know of the right, and (3) he must intend

to waive that right. They cite Commercial Metals Co. v. Pan American Trade and Investment Corp., 39 Del.Ch. 234, 163 A.2d 264 (Supr.Ct.1960); Klein v. American Luggage Works, Inc., 2 Storey 406, 158 A.2d 814 (Supr.Ct.1960), and Nathan Miller Inc. v. Northern Ins. Co., 3 Terry 523, 39 A.2d 23 (Super.Ct.1944).

 The rule concerning waiver of a right cited by the plaintiffs is of course correct, but we think it has no relevancy in the case now before us. Our reason for this is that we do not think the Vice Chancellor based his decision on the application of the law of waiver. He does, of course, conclude that the plaintiffs have effectively waived their original formal contract rights, but this conclusion must be read in the context of his findings on the facts.

It seems perfectly clear to us that the Vice Chancellor was not concerned with the formal requirements necessary to establish a waiver of a particular right. He was concerned with the resolving of the factual issue of what the conduct of the parties was and what the effect of this conduct amounted to. He found, we think, that the acceptance by the plaintiffs of the periodic price changes made by Pepsi was evidence of acquiescence by them in such price changes and necessarily, therefore, the substitution of an oral agreement for the written provisions of Paragraphs 10 of their appointments. Furthermore, the acceptance by the plaintiffs of the several other changes made over the years by Pepsi concerning other provisions of Paragraphs 10 of the appointments evidence a relinquishment on their part of the written obligations of Paragraphs 10.

The effect of the course of conduct engaged in for a period in excess of 15 years by Pepsi and the plaintiffs indicates clearly that to all intents and purposes the provisions of Paragraphs 10 of the appointments of the plaintiffs were emasculated and the price-fixing policy now followed by Pepsi was agreed to by the plaintiffs.

It is not true, as the plaintiffs argue, that this produces an inequitable result because Pepsi would have a free hand to raise its prices arbitrarily and capriciously. We think this is not the result because an unreasonable or arbitrary increase in price not based on demonstrable cost factors could be redressed in the courts.

We think the factual findings of the Vice Chancellor concerning the elements of the course of conduct followed by the parties is amply supported in the record. We therefore accept them.

The plaintiffs lay great stress upon Delaware Ins. Co. v. S. S. White Dental, 109 F. 334 (3rd Cir. 1901) in which the Court considered the rule that a written contract may be amended by the course of conduct of the parties, and concluded that under the circumstances of that case the evidence of such change was not clear and convincing enough to establish the fact. With all deference to the eminent writer of the Opinion, we respectfully disagree with his conclusion concerning the sufficiency of the evidence. In any event, we think the case is not persuasive.

The judgment below is affirmed.