**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PRECON CORPORATION; ALLIANCE
CONTRACTING, INCORPORATED,
<u>Plaintiffs-Appellees,</u>

v.                                                                              No. 95-2480

G & B ENVIRONMENTAL,
INCORPORATED,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-93-2432-PJM)

Argued: September 25, 1996

Decided: December 5, 1996

Before MURNAGHAN and HAMILTON, Circuit Judges, and
MICHAEL, Senior United States District Judge for the Western
District of Virginia, sitting by designation.

_____

Affirmed in part, vacated in part, and remanded by unpublished per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** Roger Cavenaugh Jones, HUDDLE & JONES, P.C.,
Columbia, Maryland, for Appellant. Timothy Guy Smith, TIMOTHY
GUY SMITH, P.C., Woodbine, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This appeal involves a contract dispute between appellant, G&B Environmental, Inc. (G&B), a Delaware corporation, and appellees, Precon Corporation (Precon) and Alliance Contracting, Inc. (Alliance), Maryland corporations.[1] G&B contends that the district court erred when, following a bench trial, it entered judgment in favor of Precon and Alliance in the amount of $204,788. G&B asks this court to reverse the judgment in favor of Precon and Alliance and award judgment in favor of G&B in the amount of $43,525. In the alternative, G&B asks this court to modify the judgment of the district court by reducing the amount of the judgment in favor of Precon and Alliance. For the reasons provided below, we affirm in part, vacate in part, and remand for modification of the judgment consistent with this opinion.

I.

This dispute involves two agreements between the parties for the performance of work on a construction project in Washington, D.C., known as the Veteran Affairs Building (the Project). The first agreement was a written agreement between G&B and Precon for the performance of asbestos removal work on the Project. The second agreement was a verbal agreement between G&B and Alliance for the performance of demolition work on the Project.

_____

[1] Because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $50,000, the district court properly exercised diversity jurisdiction over this dispute under 28 U.S.C. § 1332.

2

A.

These agreements originated early in 1991 when Ronald Hsu, the general contractor for the Project, approached Duane Massingale, president and owner of Precon and Alliance, about performing the asbestos removal and demolition work on the Project. Because Precon and Alliance did not have the bonding capacity for the bid, Massingale approached G&B to help finance the Project. Negotiations between the parties followed.

During at least one meeting at which the agreements were being formulated, both K.C. Goel, president of G&B and the person who entered into the agreements on behalf of G&B, and Asha Goel, K.C. Goel's wife, were present. Asha Goel was actively involved in the negotiations at that meeting and indicated that it was her money that was being advanced for the Project.

The parties eventually reached agreements with respect to both parts of the Project, and work on the Project began in mid-1991. With one exception, the parties are in accord that the agreements for both phases of the Project were identical. Because the agreement between Precon and G&B was eventually reduced to writing **2** and executed in the State of Maryland, we will consider its provisions as representative of both agreements and then discuss the single provision contained in the written contract between Precon and G&B that G&B asserts is different from that orally agreed upon by Alliance and G&B.

First, the parties agreed that the profits from both the asbestos removal and demolition phases were to be split between Precon and G&B and between Alliance and G&B, respectively. In addition, the parties agreed that no payment would be made for services rendered by the stockholders of G&B, Precon, or Alliance, and that if any sal-

_____

**2** Although the agreement between Precon and G&B is dated September 3, 1991, G&B contends that it was actually prepared and executed in January 1992 and backdated at Massingale's request to September 3, 1991. Precon does not dispute this characterization of the facts. We do not need to decide the effective date of the written contract, however, because this date is not material for purposes of the issues on appeal.

3

ary was paid, it would be treated as a distribution of profits. The agreements provided further that Massingale would provide the direction and day-to-day management of the Project, while G&B, through K.C. Goel and/or Asha Goel, would provide financial management and record keeping. In addition, under the agreements, no person other than Massingale, K.C. Goel, or Asha Goel would have the authority to commit any expenditure related to the Project. With regard to the rental of equipment, the contract between Precon and G&B stated that "each entity [would] charge the [P]roject its lowest rate, typically eighty percent of the market rate." (J.A. 14). The contract between Precon and G&B was silent with regard to other items of overhead.

Although the written agreement between Precon and G&B states clearly that both profits and losses would be divided equally between them, G&B and Alliance dispute whether they agreed to divide equally any losses incurred during the demolition phase of the Project in their oral agreement. G&B insists that they agreed that Alliance would be responsible for 100% of any loss incurred during the demolition phase of the Project, while Alliance contends that they agreed that any loss during the demolition phase would be divided equally, just as the profits were to be divided equally.

On January 14, 1992, K.C. Goel and Massingale executed an Amendment to the Agreement between Precon and G&B. This amendment provided: "It now appears that the Demolition Phase of the [P]roject will lose money instead of generating profits. Precon Corporation agrees to bear the loss incurred during the Demolition phase for Alliance Contracting's share of the loss." (J.A. 15 (emphasis added)). The underlined portion of the quoted language was handwritten and initialled by both Massingale and K.C. Goel. The rest of the amendment was typewritten.

An identical amendment to the one set forth above was prepared for the agreement between G&B and Alliance but was never executed by G&B. There is no evidence, however, that G&B refused to execute the amendment because of its handwritten portion.

The work on the Project was completed by January 1992. Thereafter, Precon and Alliance received a profit distribution in the amount

4

of $359,506.00. As part of its calculation of the profit due Precon and Alliance, G&B included in its total project costs $10,000 paid to P.K. Goel, K.C. and Asha Goel's son, and $12,000 paid to Asha Goel for work ostensibly performed for the Project. Although Precon and Alliance repeatedly asked to see the financial records from the Project, G&B failed to make any financial records available to Precon and Alliance.

B.

On August 20, 1993, Precon and Alliance filed suit against G&B in the United States District Court for the District of Maryland. Precon and Alliance alleged causes of action for breach of contract and for conversion. In their complaint, Precon and Alliance alleged that they had completed all of their obligations with respect to the Project and that G&B had not paid them the full amount of the profit due them. G&B denied liability and subsequently filed a counterclaim alleging that it had overpaid Precon and Alliance and that judgment should be rendered in its favor in the amount of $192,260.84.

Some time after Precon and Alliance filed suit, G&B computed that it was entitled to receive compensation for general office overhead attributable to the Project at the rate of 31.87%. Just prior to trial, this figure was reduced to 14.3%, and at trial, it was further reduced to 13.8%.[3]

As support for its contention that it overpaid Precon and Alliance, G&B submitted to the district court its financial statement with regard to the Project. According to this statement, the asbestos removal

_____

[3] At trial, G&B introduced the testimony of Harry Papeleo, an expert witness in accounting. Papeleo testified that the overhead rate to be charged to a particular project is calculated by dividing the total company operating expenses by the total project expenses. The total project expenses are then multiplied by that rate, and the result is the amount of overhead attributable to the project.

In this case, G&B now asserts that it is entitled to overhead at a rate of 13.8%. Multiplying 13.8% by the total direct costs of the Project, calculated by G&B to be $2,302,195, results in $317,703 that G&B is attempting to charge the Project for general office overhead.

phase of the Project resulted in a profit to the parties of $612,692, while the parties incurred a $97,799 loss during the demolition phase of the Project. This statement also reflects a charge of $113,584 to the demolition phase of the Project for G&B general office overhead.

C.

On July 5 and 6, 1995, the district court conducted a two-day bench trial. Although most of the testimony elicited the facts as stated above and, therefore, need not be recited here, G&B particularly relies on two portions of the trial testimony on appeal.

First, in response to a question on cross-examination that was apparently asked in an effort to establish that the parties did not intend to enter into a "joint venture" and, therefore, that the rules applying to joint ventures would not apply in resolving the parties' dispute, Massingale testified that the subcontract for the Project was between the general contractor, Ronald Hsu, and G&B, not between Ronald Hsu and a joint venture, consisting of G&B, Precon, and Alliance. In addition, Massingale acknowledged that while the parties had a profit sharing arrangement, they were not a joint venture as that term is commonly used.

Second, in an effort to explain overhead expenses G&B alleged should be included when calculating the profit to be shared by the parties, K.C. Goel testified that included in the general office over-head figure were depreciation costs for equipment G&B provided to the Project. K.C. Goel presented evidence that G&B had provided various pieces of equipment to the Project and that 80% of the market rental rate of all of the equipment was $63,432. According to K.C. Goel, G&B never submitted a bill for the rental equipment, but rather, included those costs in its general office overhead figure.

D.

The district court recited its findings and conclusions of law from the bench on July 6, 1995. After defining a joint venture under Maryland law as an operation of two or more persons in a single transaction for profit, the district court concluded that the agreements in this

6

case constituted a joint venture between G&B, Precon, and Alliance. Therefore, the district court stated that in the absence of a specific agreement as to how the transaction was to be conducted, the principles of joint ventures would apply and determine the outcome of the case.

The district court next interpreted the agreements to provide that Alliance would bear 50% of the losses as well as 50% of the profits from the demolition phase of the Project, as evidenced by the language in the amendment to the Precon-G&B contract providing that Precon would be liable for Alliance's "share" of the loss in the demolition phase of the Project. According to the district court, had G&B and Alliance intended Alliance to bear 100% of any demolition phase loss, the contract could have stated so explicitly.

The district court next held that because the parties had entered into a joint venture, they owed each other a fiduciary duty to account. The district court found that Precon and Alliance had repeatedly asked to see G&B's books, but G&B ignored their requests. According to the district court, G&B thereby violated its fiduciary duty toward Precon and Alliance.

The district court then considered the salaries paid to Asha Goel and to P.K. Goel and held that these payments were made in violation of G&B's fiduciary duty to Precon and Alliance. The district court acknowledged that Asha Goel claimed to have provided sixty hours a week of bookkeeping service to the Project. However, the district court expressed skepticism with regard to this claim, noting that Asha Goel also testified to having worked full-time as an elementary school teacher during the time period in question. In addition, the district court found that the extent of Asha Goel's participation in the initial negotiations and her behavior in connection with the transaction suggested that she was some sort of equity owner in the business. The district court found that Asha Goel had participated actively in the negotiations between the parties and discussed putting money into the Project and that while neither K.C. nor Asha Goel was ever asked whether Asha Goel was a shareholder, neither disclosed that she was not a shareholder. Because it would have been reasonable for Massingale to assume that Asha Goel was an equity owner, the district court concluded that she should not get a separate salary which would

7

reduce the profit from the Project. With regard to the salary payments to P.K. Goel, the district court found that he performed no services and concluded, therefore, that salary payments to him were a clear breach of fiduciary duty.

The district court next considered G&B's claimed entitlement to overhead. The district court first held that overhead items that are not specifically tied to the joint venture may not be charged to the Project in the absence of a specific agreement that overhead expenses would be charged to the Project. In this case, the district court held that the items of overhead for which G&B wanted to charge the Project could not be tied to the joint venture. Therefore, the district court concluded that they are not recoverable.

Precon and Alliance also submitted at trial a claim for equipment and supplies totalling $26,000 and $20,000, respectively. The district court concluded that they had not proved by a preponderance of the evidence that the equipment was taken or bought by the job. Therefore, the district court denied this claim, and Precon and Alliance have not appealed that decision.

Finally, the district court decided to award prejudgment interest to Precon and Alliance in the amount of 6% per annum on the base amount of $170,535 it determined G&B owed to Precon and Alliance. The district court reasoned that the amounts owed to Precon and Alliance were liquidated sums that were due and payable at least by March 1, 1992, following the completion of the Project. The district court found further that G&B had acted improperly in not immediately giving Precon and Alliance an accounting when asked. On July 6, 1995, the district court entered judgment in favor of Precon and Alliance in the amount of $204,788. From this judgment, G&B now appeals.

II.

On appeal from a bench trial, we may only set aside findings of fact if they are clearly erroneous, and we must give due regard to the opportunity of the district court to judge the credibility of the witnesses. See FED. R. CIV. P. 52(a). "A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on

8

the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). We review the district court's conclusions of law de novo. Resolution Trust Corp. v. Maplewood Inv., 31 F.3d 1276, 1281 n.7 (4th Cir. 1994).

III.

The first issue raised by G&B on appeal is whether the district court erred when it held that the agreements between the parties in this case constituted a joint venture under Maryland law. Because many of the district court's conclusions of law depended on its holding that the agreements constituted a joint venture, we will address this issue first.

A.

A joint venture exists under Maryland law[4] "when two or more persons combine in a joint business enterprise for their mutual (benefit with the understanding that they are to share in profits or losses and that each is to have a voice in its management." Brenner v. Plitt, 34 A.2d 853, 857 (Md. 1943). Thus, "[m]ere agreement to share in profits, of itself, constitutes neither a partnership nor a joint [ ]venture." Id. In addition, the determination of whether a joint venture exists "depends upon the intentions of the parties which is to be determined from the facts of the case and in accordance with ordinary rules governing interpretation of contracts." Finch v. Hughes Aircraft Co., 469 A.2d 867, 890 (Md. Ct. Spec. App.), cert. denied , 469 A.2d 864 (Md.), and cert. denied, 475 A.2d 1200 (Md. 1984).

B.

Applying these principles to the facts in this case, we agree with the district court that the agreements between the parties in this case constituted a joint venture. With regard to the agreement concerning

_____

[4] The parties do not dispute that Maryland law applies to the interpretation of the agreements at issue in this case. See Kramer v. Bally's Park Place, Inc., 535 A.2d 466, 467 (Md. 1988) ("[T]he law of the jurisdiction where the contract was made controls its validity and construction.").

9

the asbestos removal phase of the Project, the written contract entered into between Precon and G&B provided explicitly that both profits and losses from the asbestos removal phase of the Project were to be "shared equally" between them. In addition, the agreement provided for each party to have a voice in the management of the venture: Precon and Alliance owner Mr. Massingale was to provide the direction and day-to-day management of the Project, while G&B, through either K.C. or Asha Goel, was to provide the financial management and record keeping. Further, the agreement explicitly provided that any of the three individuals named above had the authority to commit expenditures related to the Project. Because the agreement provided for the sharing of profits and losses and for each party to have a voice in the management of the enterprise, the district court correctly held that the agreement constituted a joint venture between Precon and G&B for the asbestos removal phase of the Project.

Determining whether the agreement between Alliance and G&B constituted a joint venture under Maryland law is a closer question because the parties dispute whether Alliance and G&B agreed to share losses. G&B asserts that Alliance agreed to assume liability for all losses incurred during the demolition phase of the Project. However, neither G&B nor Alliance disputes the fact that they agreed to share profits, nor does either dispute that they both had a voice in the management of the enterprise. Therefore, the enterprise constitutes a joint venture under Brenner. See Brenner , 34 A.2d at 857 (defining joint venture as an association in which "two or more persons combine in a joint enterprise for their mutual benefit with the understanding that they are to share in profits or losses and that each is to have a voice in its management").

G&B argues, however, that the testimony provided by the parties during the trial suggests that the parties did not intend to enter into a joint venture. In particular, G&B cites Massingale's testimony that there was no contract between Ronald Hsu and a joint venture and his testimony that while the parties had a profit sharing arrangement, they were not a joint venture as that term is commonly used. The question in this case, however, is not whether the parties believed that they had entered into a joint venture as that term is commonly used, but rather it is whether the parties intended to enter into an association that constitutes a joint venture as that term is defined under Maryland law. In

10

answering this question, we look not only to the facts of the case, but also to the contracts agreed upon, interpreting them in accordance with ordinary rules governing the interpretation of contracts. See Finch, 469 A.2d at 890. In this case, because it is undisputed that the parties intended to share profits and the management of the venture and because the written contract between Precon and G&B states so explicitly, we agree with the district court that the parties intended to enter into an association that constitutes a joint venture under Maryland law.

IV.

The next issue raised by G&B on appeal is whether the district court erred when it excluded G&B's home office overhead expenses, salaries to non-shareholders, and equipment rental costs in calculating the profit to be shared by the parties. Before we address each of these contentions in turn, we find it helpful to summarize the nature of a joint venture relationship.

A.

Partners in a joint venture stand in a fiduciary relationship toward one another. Herring v. Offutt, 295 A.2d 876, 879 (Md. 1972). According to the Maryland Court of Appeals, "[t]he partnership relationship is of a fiduciary character which carries with it the requirement of utmost good faith and loyalty and the obligation of each member of the partnership to make full disclosure of all known information that is significant and material to the affairs or property of the partnership." Id.; see also Geo. Bert. Cropper, Inc. v. Wisterco Investments, Inc., 399 A.2d 585, 592 (Md. 1979) (law of partnership applies to joint ventures). In addition, "the principle of utmost good faith covers not only dealings and transactions occurring during the partnership but also those taking place during the negotiations leading to the formation of the partnership." Allen v. Steinberg, 223 A.2d 240, 246 (Md. 1966). A joint venture has been described as"`a partnership for a single transaction,'" Herring, 295 A.2d at 597 (citation omitted), and, thus, differs from a traditional partnership in its limitation to a discrete project.

11

B.

We first address G&B's argument that the district court erred when it excluded G&B's home office overhead expenses from the calculation of the profit to be shared by the parties.

1.

Although we have found no Maryland case directly addressing the impact of the nature of the joint venture relationship on the ability of a party to charge home office overhead expenses to the joint venture, we follow the general rule that a partner in a joint venture may not charge the joint venture for home office overhead expenses. As stated above, the joint venture relationship is akin to a partnership, but it is a partnership "for a single transaction." See Herring, 295 A.2d at 879 (internal quotation marks and citation omitted) (emphasis added). Unlike in a general partnership, in which every expense incurred by one partner affects the other partners, in a joint venture, only expenses incurred with respect to the particular project affect the other partner. Therefore, only expenses directly attributable to the specific project undertaken may be charged to the joint venture. Of course, the parties may enter into an agreement explicitly permitting home office overhead to be charged to the joint venture. However, in the absence of such an agreement, only those charges that are directly attributable to the specific project may be charged to the joint venture.

The Delaware Supreme Court reached this same conclusion in Commercial Metals Co. v. Pan Am. Trade & Inv. Corp. , 163 A.2d 264 (Del. 1960). In Commercial Metals, the Delaware Supreme Court held that general overhead expenses were properly excluded from the gross profit of the joint venture where the overhead "represented an attempt by one joint venturer to charge compensation for services in providing capital and in providing the organization to handle the transaction." Id. at 268. According to the Commercial Metals court, "[t]he general rule is that a coadventurer is not entitled to interest on capital which he is bound to furnish, nor to general overhead costs representing an allocation of cost of rendering services in furtherance of the joint venture." Id. (emphasis added).

12

2.

Applying these principles to the facts of this case, we note first that the written contract between Precon and G&B is silent with regard to home office overhead expenses. Since partners in a joint venture may not charge the joint venture for costs that are neither permitted by their agreement nor directly attributable to the joint venture, we agree with the district court that G&B should not be able to charge the joint venture for its home office overhead costs. Therefore, the district court correctly excluded these costs when it calculated the profits to be divided between the parties.

G&B argues, however, that its contract with Precon was not silent with regard to overhead expenses. According to G&B, salaries paid to stockholders are normally carried in the general overhead of a project, and since its contract with Precon explicitly excludes such payments from the calculation of gross profit, the agreement implicitly permits the inclusion of other forms of overhead in the calculation. However, salaries paid to stockholders for services rendered to the joint venture are costs directly attributable to the specific project undertaken, even if not allowed, while overhead expenses such as home office expenses are not directly attributable to the project. Rather, home office expenses are a cost of doing business in general.[5] Therefore, even if the contract can be construed as permitting the parties to charge the joint venture costs other than shareholder salaries that are directly attributable to the venture, it is silent with regard to home office overhead expenses. In the face of such silence, these expenses must be excluded from the calculation of profit.

C.

Bearing in mind the fiduciary nature of the relationship between partners in a joint venture, we also agree with the district court that the $10,000 paid to P.K. Goel and the $12,000 paid to Asha Goel as

_____

[5] This point is illustrated by G&B's method of calculating general overhead expenses which is to divide the total company operating expenses by the total project expenses. In this case, the overhead rate to be charged was initially calculated at 31.87%, was reduced to 14.3% just prior to trial, and was further reduced to 13.8% at trial.

13

salary payments should not be considered an expense to the Project when calculating the profit to be shared by the parties. As noted above, the district court found that P.K. Goel provided no services to the Project. Therefore, there is no question but that G&B violated its fiduciary duty toward Precon and Alliance when it used revenue from the Project to pay P.K. Goel for services that he never provided.

Similarly, we agree with the district court that the salary payments made to Asha Goel should be excluded when calculating the profit to be shared by the parties. As noted above, according to the provisions of the written contract between G&B and Precon, no payment would be made for services rendered by the shareholders of G&B and Precon. Instead, any salary paid to shareholders would be treated as a distribution of profits. On the other hand, payments to non-shareholders would be treated as an expense when calculating profit and, therefore, would reduce the amount of net profit.

In this case, the district court found that Asha Goel held herself out as an equity owner in G&B by participating actively in the negotiations between the parties and by telling Massingale that she was providing funds for the Project. In addition, the written agreement between Precon and G&B places Asha Goel on par with the corporations' presidents and shareholders by giving her the authority to commit expenditures on behalf of the joint venture and by naming her, along with K.C. Goel, as responsible for the financial management of the Project.

Given that the agreement included a provision expressly excluding shareholder salaries as an expense that could be charged to the Project when calculating profit and the district court's finding that Asha Goel held herself out as an equity owner of G&B, we agree that K.C. Goel, as the president of G&B and as G&B's primary representative during the negotiations, had a fiduciary duty to disclose that Asha Goel was not a shareholder of G&B. As the Maryland Court of Appeals has stated, "the principle of utmost good faith covers not only dealings and transactions occurring during the partnership but also those taking place during the negotiations leading to the formation of the partnership." Allen, 223 A.2d at 246. In addition, the fiduciary relationship between partners includes "the obligation of each member of the partnership to make full disclosure of all known information that is signif-

14

icant and material to the affairs or property of the partnership." Herring, 295 A.2d at 879.

In this case, K.C. and Asha Goel did not act according to the principle of utmost good faith during the negotiations when they held Asha Goel out as a shareholder of G&B and then failed to clarify her status, despite contractual provisions under which her status as non-shareholder would affect the profits of the joint venture. Therefore, the district court correctly excluded the $12,000 paid to her as salary from the calculation of profit to be shared by the parties.

D.

G&B's final contention with regard to the district court's exclusion of certain costs from the calculation of the shared profit is that the district court improperly excluded G&B's equipment rental costs when it calculated the profit to be shared by the parties. Although G&B acknowledges that it initially included its equipment costs in its home office overhead, which we have held was properly excluded by the district court, G&B contends that it submitted alternative evidence to the district court detailing the various pieces of equipment sent to the Project by G&B and the equipment rental cost of each piece of equipment at 80% of the market rate. These costs, G&B argues, should have been included in the calculation of the profit, even if other portions of the home office overhead were properly excluded, because the written contract between Precon and G&B expressly provides that "[f]or rental of equipment, each entity will charge the [P]roject its lowest rate, typically eighty percent of the market rates." (J.A. at 14).

We agree with G&B that the district court erred when it failed to include rental equipment costs at 80% of the market rate in the calculation of the profit to be shared by the parties. As correctly noted by G&B, the written contract between Precon and G&B expressly provides that each entity would charge the Project its lowest rate for the rental of equipment to the Project, typically 80% of the market rate. In this case, G&B has submitted unrefuted evidence that it loaned a significant amount of equipment to the Project and that 80% of its rental market rate was $63,432. While G&B initially included these costs in its home office overhead and, thus, did not submit a separate claim for them to either Precon or Alliance, the agreements between

15

the parties expressly provide that such costs may be charged to the Project. Therefore, the district court should have included these costs when calculating the profit to be shared by the parties in this case.

V.

G&B next asserts that the district court erred when it interpreted the agreements to require that Precon assume only 50% of the losses attributable to the demolition phase of the Project. According to G&B, Alliance agreed to bear 100% of any losses incurred during the demolition phase of the Project, and Precon later assumed that responsibility when it agreed to bear responsibility for Alliance's share of any losses in the amendment to its agreement with G&B. As a result of this alleged misinterpretation, G&B argues that the district court failed to allocate 100% of the losses incurred during the demolition phase of the Project to Precon and Alliance.

This dispute is moot, however, under our earlier holding that G&B is not permitted to charge the Project for home office overhead. According to G&B's own calculations presented to the district court, it charged $113,584 in home office overhead to the demolition phase of the Project, and that phase of the Project incurred losses totaling $97,799. If home office overhead is omitted as a cost charged to the Project, the demolition phase of the Project incurred no losses, but rather generated a profit of $15,785. Since no losses can, therefore, be attributed to the demolition phase of the Project, the allocation of responsibility for any such losses is a moot point.

VI.

Finally, G&B asserts that the district court abused its discretion when it awarded Precon and Alliance prejudgment interest. The district court awarded prejudgment interest at a rate of 6% per annum based on its conclusion that G&B had breached its fiduciary duty toward Precon and Alliance and had withheld payment on a sum that was liquidated and due at least as of March 1, 1992. G&B argues that the district court's choice of March 1, 1992 as the date from which prejudgment interest would be calculated was arbitrary and that the sum owed to Precon and Alliance was not liquidated until after the district court issued its decision. We disagree.

16

A.

The award of prejudgment interest is recoverable as a matter of right in some circumstances. See I.W. Berman Prop. v. Porter Bros., Inc., 344 A.2d 65, 75 (Md. 1975) (prejudgment interest recoverable as matter of right under contracts in writing to pay money on certain day). However, "[t]he award of prejudgment interest is generally left to the discretion of the trial judge" and is "based on the `equity and justice appearing between the parties and a consideration of all the circumstances.'" Agnew v. Maryland, 446 A.2d 425, 447 (Md. App. 1982) (citation omitted).

B.

We hold that the district court acted within its discretion when it awarded 6% per annum prejudgment interest to Precon and Alliance from March 1, 1992. In accordance with the principles set forth above, the district court explicitly based its award of prejudgment interest on a consideration of all of the circumstances in this case and on its conclusion that G&B had violated its fiduciary duty toward Precon and Alliance. We affirm both the award and the date from which interest is to be calculated as properly within the district court's discretion.

VII.

For the reasons set forth above, we affirm in part the district court's judgment in favor of Precon and Alliance. We hold, however, that the judgment should be modified to take into account equipment rental costs incurred by G&B and expressly permitted by the agreements at issue. Therefore, we affirm in part, vacate in part, and remand for the district court to modify the judgment consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

17