IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IMO:                                        )
THE ESTATE OF                               )          C.A. No. 7430-ML
PAULINA duPONT DEAN                         )


MASTER'S REPORT


Date Submitted:  November 12, 2013
Draft Report:  February 28, 2014
Exceptions Submitted: May 22, 2014
Final Report: June 30, 2014


Carl D. Neff, Esquire, of FOX ROTHSCHILD LLP, Wilmington, Delaware; Attorney for Petitioner.

James S. Green, Sr., Esquire and Jared T. Green, Esquire, of SEITZ VAN OGTROP & GREEN, P.A., Wilmington, Delaware; Attorneys for Respondent.


LEGROW, Master

Two children of an elderly, wealthy woman are engaged in what threatens to be only the opening act in a legal drama that may yet unfold between them. The questions presented in this case are relatively simple: first, whether the respondent is entitled to an accounting from the petitioner, who holds power of attorney for their mother, and second, whether the attorney-in-fact is required to reimburse the respondent for expenses the respondent incurred for his children's education. Overlaid on those discrete issues are a complicated family history and the specter of looming disputes regarding transactions the attorney-in-fact conducted on his mother's behalf.

For the reasons that follow, I conclude the respondent is entitled to a forensic accounting of the transactions the attorney-in-fact conducted on his mother's behalf, beginning on the date the power of attorney was executed. Nothing in the power of attorney indicated its effectiveness would spring from a future event or contingency, and the petitioner accepted his position as agent by exercising nearly complete control over his mother's finances after the power of attorney was signed. I further conclude that the respondent is entitled to reimbursement of educational expenses he incurred consistent with his mother's past pattern of giving, which I attempt to define despite both parties' difficulty in articulating a coherent pattern to such reimbursement. What follows is my post-trial final report.

## BACKGROUND

These are the facts as I find them after trial. Although Paulina du Pont Dean ("Paulina")[1] and her estate are the subject of this case, she did not participate in this action in any way. Now in her late eighties, Paulina was declared incompetent in 2009[2] and her son testified that her mental acumen has deteriorated steadily since that time.[3] The parties to this action are Paulina's only two surviving children: William Kemble Ketcham ("Kem"), who is the petitioner, and J.S. Dean Ketcham ("Dean"), who is the respondent. Kem has three children, Paulina, Samuel, and Sara, and Dean has four children, Jacob, Dougal, Reiver, and Idaho.

Kem and Dean are named in Paulina's will as the beneficiaries of her residuary estate.[4] Paulina resides in Tortola, BVI. In the late 1990s, Paulina opened two accounts at Banco Popular in Tortola: an account ending in '919 (the "919 Account") and an account ending in '955 (the "955 Account").[5] Kem was a signatory on both accounts from their creation.[6] Paulina used the 955 Account to pay her own expenses, while Kem used the 919 Account as a "holding account," which he used to hold larger balances, pay more significant expenses, fund various investments, and the like. The transactions in the 919 Account form much of the basis for the parties' dispute.

---

[1] I use the parties' first names for the sake of clarity. No disrespect is intended.
[2] Joint Trial Exhibit (hereinafter "JX") 18.
[3] *In re Paulina du Pont Dean*, C.A. No. 7430-ML (May 13, 2013) (TRIAL TRANSCRIPT) (hereinafter "Tr.") at 103-04.
[4] Joint Stipulation and Pretrial Order (hereinafter "Pre-Trial Order") ¶ 2(e).
[5] Tr. at 6-7.
[6] *Id*. at 7-8.

Although both Kem and Dean reside in the United States, Kem maintains – or maintained for a period of time – several business operations in Tortola. Among those businesses is Tortola Home, LLC ("THL"). THL is a now-defunct construction finance company established in 2003.[7] Some documents indicate Paulina "invested" at least $3 million in THL between 2003 and 2008.[8] The nature of those investments is not clear. Although Paulina's assistant identified Paulina as one of three "shareholders" of THL, Kem testified that there were no shares issued in THL, that only he and Paulina had an interest in the company, that THL "only had debt," and that nearly all of the debt was held by Paulina.[9] THL is no longer operating, but it continues to maintain a bank account, and funds in that account are used to pay Paulina's regular living expenses.[10] Kem's explanation of this process is inconsistent. Although he testified at trial that he regularly transferred money from Paulina's 919 Account to THL's account for the purpose of paying Paulina's regular expenses,[11] when asked why Paulina's expenses were paid from THL instead of directly from her own accounts, Kem explained "it would go into the books as basically a reduction of the money that she had contributed."[12] In other words, THL already owed substantial debt to Paulina, and THL paid Paulina's expenses to reduce that debt, but received additional contributions from Paulina to fund the payment of expenses. A post-trial affidavit submitted by Kem offered a different

---

[7] JX 14.
[8] *Id*.
[9] Tr. at 77-78.
[10] *Id*. at 76-77, 94-95.
[11] *Id*. at 91-92
[12] *Id*. at 94-95.

3

explanation of how Paulina's expenses were paid: Kem claimed $1.5 million transferred from the 919 Account to the 955 Account was for payment of Paulina's monthly expenses, including "payroll, utilities, travel expenses when she traveled, and a live-in nurse."[13]

On October 26, 2004, Paulina executed a durable power of attorney in Delaware, naming Kem as her attorney-in-fact (the "Power of Attorney").[14] Kem received a copy of the Power of Attorney shortly thereafter, but claims he did not act as Paulina's agent under the Power of Attorney until she was declared incompetent in 2009. Kem testified that he had "no reason to have – use a Power of Attorney" before 2009, and he maintained the document in his safe from 2004 to 2009.[15] After she signed the Power of Attorney, Paulina continued to write and sign checks in her own name and signed her own tax returns.[16] Kem also conceded, however, that very little changed even after he began "acting" as Paulina's attorney-in-fact, except the "four or five times" he signed tax returns and change of address forms on her behalf "in the last couple years."[17] Kem's control over Paulina's funds did not meaningfully change after the Power of Attorney was executed in 2004, nor did it change after he acknowledges "acting" as Paulina's Power of Attorney in 2009. Kem's authority under the Power of Attorney includes nearly total control over Paulina's finances, and – particularly relevant to this case – the

---

[13] Aff. of William Kemble Ketcham in support of Petitioner's Post-Trial Reply Br. (hereinafter "Kem's Post-Trial Affidavit") ¶ 1(j) and Ex. A. Dean's motion to strike this affidavit is addressed below.
[14] JX 12; Pre-Trial Order ¶ 2(f).
[15] Tr. at 16-17.
[16] *Id*. at 20.
[17] *Id*. at 19-20.

4

power to make gifts out of Paulina's property and on her behalf "to one or more of [her] issue of whatever degree, including gifts to [Kem], in a manner consistent with [Paulina's] past pattern of giving, in [Kem's] sole and absolute discretion."[18]

In 2008, if not before, Dean began raising questions about his mother's financial affairs. When he was not satisfied with answers he received from Kem, Dean went directly to his mother and obtained her written permission to receive information about both the 919 Account and THL.[19] Although Kem claims it is mere coincidence, Dean's questions about Paulina's affairs were followed closely in time by Kem's declaration that his role in Paulina's financial affairs had changed, and now was directed by the Power of Attorney. The proximity of these events strikes me as unlikely to be coincidental: Dean obtained Paulina's signature to access the 919 Account and THL's information on June 9, 2009,[20] Paulina was examined by a neurologist on June 11, 2009,[21] the neurologist issued a letter on July 28, 2009, declaring Paulina "disabled and incapacitated to such an extent that she is unable properly to manage her own financial affairs,"[22] and Kem declared on July 31, 2009 that his "role with regards to [Paulina's] financial affairs ha[d] changed … [and was] now directed by the durable Power of Attorney and [the neurologist's] diagnosis."[23]

---

[18] JX 2 at 3, ¶ 27.
[19] JX 10; Tr. at 141-44.
[20] *Id.*
[21] *See* JX 18.
[22] *Id.*
[23] JX 28.

When Dean obtained access to Paulina's 919 Account, he noted a number of transfers from the 919 Account to other Banco Popular accounts, including three accounts ending in '928 (the "928 Account), '937 (the "937 Account") and '946 (the "946 Account"). Dean pressed Kem about those accounts, and understood from Kem's explanation that the accounts belonged to Kem or his wife and were reimbursement for Kem's children's educational expenses.[24]

The parties agree that Paulina's past pattern of giving included paying for her grandchildren's educational expenses as a matter of course. They dispute – and struggle to articulate a coherent position regarding – what that pattern precisely entailed. Paulina gave her Delaware accountant, William Master, instructions to pay or reimburse bills Dean or Kem submitted for her grandchildren's tuition expenses.[25] Dean's practice was to submit education-related bills to Mr. Master, and between 1987 and 2001, Mr. Master paid on Paulina's behalf $527,333.14 toward Dean's children's education.[26] The bills Dean submitted comprised invoices he received from the various educational institutions his children attended. Kem, on the other hand, rarely submitted bills or reimbursement requests to Mr. Master, and instead wrote checks directly from the 919 Account or reimbursed himself from the 919 Account.[27] Kem did not maintain any records of these transactions.[28] For one period between July 2004 and August 2006, Kem did submit bills

---

[24] Tr. at 146-147.
[25] Pre-Trial Order ¶ 2(h); Deposition of William H. Master, CPA (Dec. 11, 2012) (hereinafter 'Master Dep.") at 9.
[26] Pre-Trial Order ¶ 2(j).
[27] Tr. at 67-68.
[28] *Id*. at 69.

or reimbursement requests to Mr. Master. In that period, Mr. Master paid on Paulina's behalf $146,961.84 toward Kem's children's education.[29] The bills Kem submitted to Mr. Master included invoices from several different educational institutions. Those invoices covered tuition, room and board, medical expenses, technology charges, social activities, and campus store charges.[30]

In 2001 or 2002, Dean stopped requesting reimbursement or payment of his children's educational expenses. He moved to Maine in that period, and Dean testified he made an effort to "remov[e] myself from my former life."[31] He concluded he could pay his children's educational expenses without assistance, and did just that.[32] It was not until 2010, when Dean realized Kem continued to receive reimbursement for his children's education, which Dean concluded he should seek reimbursement for past expenses because every dollar he did not seek in reimbursement was $0.50 that Kem would receive when Paulina passed away.[33]

Dean therefore asked Kem, as Paulina's attorney-in-fact, to reimburse Dean for educational expenses he incurred after 2001. Kem refused, citing Dean's failure to seek reimbursement in a "timely" manner, and his failure to provide receipts and invoices for the expenses listed. Kem asserted that reimbursement of under those circumstances would be inconsistent with Mrs. Dean's past pattern of giving. Dean's request for reimbursement was supported by a spreadsheet he obtained through the Quicken software

---

[29] Pre-Trial Order at 2(i).
[30] JX 8; Tr. at 72-73.
[31] Tr. at 148.
[32] *Id*. at 148.
[33] *Id*. at 148-49; JX 21.

program Dean uses to track his finances. Dean regularly enters his financial information into Quicken and assigns a category to all expenditures.[34] The information is added to Quicken contemporaneously, backed by Dean's bank statements and cancelled checks, and used to "reconcile" Dean's records with his bank's records.[35] Dean seeks reimbursement for expenses he categorized as "education" between September 1, 2001 and March 23, 2011, and offers three alternate sums to which he may be entitled. Dean contends he is entitled to $651,309.72 if the Court broadly defines Paulina's past pattern of giving to include anything the parties designate as educational expenses, including travel expenses, computers, licensing fees, and similar items.[36] Alternatively, if I conclude the scope of Paulina's gifting pattern is more narrow, Dean contends he expended $551,813.73 in tuition, room, and board during the relevant period, or $421,127.76 if Paulina's pattern is limited to payments directly to educational institutions.[37]

When the parties could not resolve their dispute regarding reimbursement of Dean's children's educational expenses, Kem filed a petition under 10 *Del. C.* § 6504, asking this Court to provide instructions regarding reimbursement of the parties' educational expenses. Dean then filed a counterclaim seeking, *inter alia*, an accounting of all transactions and activities Kem has engaged in as Paulina's agent under the Power

---

[34] Tr. at 151-52.
[35] *Id*. at 151-52, 156.
[36] JX 5.
[37] JX 6, J.S. Dean Ketcham's Opening Post-Trial Br. (hereinafter "Dean Opening Br.") at 7-8, 24

of Attorney, and an accounting of all funds Kem paid to or for the benefit of himself or his family.[38] The parties engaged in discovery and this case was tried on May 13, 2013.

**ANALYSIS**

There presently are two primary disputes between the parties, although the post-trial briefing foreshadows many other disputes that may arise, depending in part on how these disputes are resolved. At present, I need only determine (1) whether Kem is required to account for his transactions on behalf of Paulina and, if so, the appropriate period for such accounting, and (2) the extent to which Dean is entitled to reimbursement from Paulina's estate for Dean's children's educational expenses. I also address in this report ancillary issues related to the parties' attorneys' fees and three outstanding motions to strike.

## I. KEM IS REQUIRED TO ACCOUNT FOR HIS TRANSACTIONS ON PAULINA'S BEHALF FROM OCTOBER 26, 2004 THROUGH THE PRESENT.

Dean argues he is entitled to seek an accounting from Kem for all the transactions Kem conducted on Paulina's behalf after the Power of Attorney was executed in 2004. Kem argues any accounting this Court orders should begin no earlier than the date Paulina was declared incompetent, which is the date Kem contends he began acting as Paulina's agent. Kem further argues that no accounting should be ordered by this Court because he already has prepared an "accounting" identifying all transfers into and out of Paulina's Banco Popular accounts in what Kem contends is the relevant period. Dean

---

[38] JX 24 at 10.

dismisses these "accountings" as nearly useless and argues that a forensic accounting is warranted under the circumstances.

As an initial matter, the parties agree that Dean has standing to seek an accounting from his mother's attorney-in-fact.[39] Under Delaware's Durable Personal Powers of Attorney Act (the "Act"), this Court may compel an agent to "account for transactions conducted on the principal's behalf" under a power of attorney.[40] Kem contends, however, that he did not conduct any transactions as Paulina's agent until she was declared incompetent on July 28, 2009.

Kem contends that it was his "understanding" that the Power of Attorney was not effective unless and until Paulina became incompetent.[41] The Power of Attorney, however, contains no such springing effective date.[42] Under the Act, a personal power of attorney is effective when executed unless the power of attorney specifically provides that it becomes effective at a future date or upon a future event or contingency.[43] Kem's understanding of the Power of Attorney cannot vary the terms of the document itself. There is nothing, other than Kem's self-serving testimony, to support a conclusion that Paulina intended the Power of Attorney to be contingent on her incapacity. Although Kem points out that Paulina continued to sign documents and exercise some control over her finances after she executed the Power of Attorney, that argument is a non sequitur. A

---

[39] *See* 12 *Del. C.* § 49A-116(a)(3), (b)(2); Post-Trial Opening Br. of William Kemble Ketcham (hereinafter "Kem Opening Br.") at 17.
[40] 12 *Del. C.* § 49A-116(a)(3).
[41] Tr. at 15-17.
[42] *See* JX 12.
[43] 12 *Del. C.* § 49A-109(a).

principal does not divest herself of authority to manage her affairs simply by granting another the authority also to act on her behalf. The Power of Attorney does not strip Paulina of powers, but instead grants Kem certain powers and attendant responsibilities. Although the doctor's declaration of Paulina's incompetence may have relevance to Paulina's continued ability to manage her own affairs, it is not the source from which Kem's authority as agent springs.

Kem argues, however, that he did not accept his role as Paulina's agent until she was declared incompetent, and therefore he cannot be required to account for transactions he undertook on her behalf before that time.[44] The Act provides:

> Except as otherwise provided in the personal power of attorney, a person accepts appointment as an agent under a personal power of attorney by signing the agent's certification (pursuant to § 49A-105(c) of this title) or by exercising authority or performing duties as an agent or by any other assertion or conduct indicating acceptance.[45]

The Power of Attorney was executed before Section 49A-105(c) was adopted, so Kem did not execute an agent's certification under that Section. He concedes, however, that he received a copy of the Power of Attorney shortly after its execution and maintained a copy in his safe from 2004 to 2009.

---

[44] Dean argued that, in response to an earlier motion to compel, I held that Kem was required to account for the period of October 26, 2004 to July 28, 2009, and that the ruling was now law of the case. *See* J.S. Dean Ketcham's Post-Trial Reply Br. (hereinafter "Dean Reply Br.") at 9-11. That argument misconstrues my earlier ruling. In granting Dean's motion to compel, I held that the evidence sought, which included information about Kem's transactions on Paulina's behalf between 2004 and 2009, was reasonably calculated to lead to the discovery of admissible evidence regarding whether Kem was acting as Paulina's agent during that period. *In re Paulina du Pont Dean*, C.A. No. 7430-ML (May 1, 2013) (TRANSCRIPT) at 28-29. That ruling did not constitute a determination that Kem was required to account for his activities as agent during that period. Kem's motion to strike this portion of Dean's reply brief should be denied as moot, however, because I have not rested my conclusion on Dean's law of the case argument.
[45] 12 *Del. C.* § 49A-113.

According to Kem, there was "no reason to … use [the] Power of Attorney" until 2009.[46]  He claims the need arose after Paulina was declared incompetent in 2009, but concedes that, after 2009, very little changed in his control over Paulina's affairs, except that he executed a few legal documents on her behalf.  Indeed, from the time Paulina gave Kem access to her Banco Popular accounts, Kem has wielded almost unfettered control over Paulina's financial affairs.  To an outside observer, Kem's access to Paulina's accounts, and his frequent use of those accounts to transact business on her behalf, is consistent with someone "exercising authority or performing duties as an agent."  That Kem's position as signatory on the Banco Popular accounts allowed him to assert authority over Paulina's financial affairs without showing the Power of Attorney to anyone does not change the fact that Paulina designated him as her agent – and fiduciary – in 2004, without any indication that the designation was contingent on a future event, and Kem continued to exercise authority over her affairs after that date consistent with acts of an attorney-in-fact.  In short, the fact that Kem did not "need" the Power of Attorney until Dean began asking questions and obtaining access to Paulina's financial records does not mean that Kem did not accept the appointment by regularly acting on Paulina's behalf after she executed the Power of Attorney.

Because Kem became Paulina's agent upon execution of the Power of Attorney, he is obligated to account for transactions conducted on Paulina's behalf beginning on

---

[46] Tr. at 17.

October 26, 2004.[47] Kem asserts he already has provided bank statements for the 919 Account and the 955 Account for July 28, 2009 through trial, and has responded to Dean's questions in discovery and at trial about various transactions. Kem also prepared two documents summarizing the transactions in those accounts.[48] In connection with his post-trial reply brief, Kem also submitted an affidavit and spreadsheet "detailing the purpose of transactions constituting approximately $28 million which flowed into or out of the 919 Account from October 26, 2004 to July 28, 2009."[49]

As a preliminary issue, Dean filed a motion to strike Kem's affidavit as an improper attempt to supplement the record after trial. Dean is correct that some, though not all, of the information contained in Kem's affidavit and accompanying exhibits amounts to new evidence that was not provided in discovery or introduced at trial. Although Kem argues that this Court should admit the new evidence because Kem satisfies the factors typically considered by Delaware courts when a party moves to reopen the trial record, Kem has filed no such motion, and therefore cannot seek that relief. Motions to strike are not favored in this Court, however, and a more limited

---

[47] In his post-trial reply brief, Kem argued that "Dean's request for an [a]ccounting [was] barred by the statute of limitations and the equitable doctrine of laches," and that any accounting should be limited to a period no more than three years before this action was filed. *See* Post-Trial Reply Br. of Petitioner William Kemble Ketcham (hereinafter "Kem Reply Br.") at 11. Dean moved to strike this portion of Kem's brief because Kem did not raise laches or the statute of limitations as affirmative defenses to Dean's counterclaim seeking an accounting. In response to the motion to strike and at argument, Kem's counsel contended that the laches argument was limited to Dean's effort to seek monetary damages for Kem's alleged breach of his fiduciary duties as Paulina's agent. *See* n. 54, *supra.* Although the post-trial reply brief explicitly states that the laches defense was directed to Dean's request for an accounting, I recommend that the Court deny the motion to strike because Kem has withdrawn his timeliness defense to the accounting request.

[48] JX 19-20.

[49] Kem's Post-Trial Affidavit ¶ 1 and Ex. A.

remedy is appropriate in this case. I recommend that the Court deny the motion to strike, but refuse to consider the new evidence in Kem's affidavit as support for any of Kem's post-trial arguments. In that way, the affidavit will remain part of the record should Dean need to refer to it in later proceedings, but Kem will not be able to rely on evidence that he introduced after trial and without a proper motion to reopen the record.

Turning then to the issue at hand, neither the assembled bank statements nor the accompanying documents prepared by Kem, amount to a proper accounting under the Act. The documents Kem prepared, and the bank statements on which they were based, do not even cover the full period of July 28, 2009 through the present,[50] and do not cover the period back to October 2004. For transfers out of those accounts, of which there were many, the summaries and the bank statements do no more than identify the other accounts to which funds were transferred, without identifying the purpose of the transfer. For example, Kem's summary of the 919 Account identifies $715,000.20 in transfers to THL between 2009 and 2011, with no further explanation for the transfer. Although Kem testified at trial that THL paid Paulina's expenses in order to reduce the amount owed to her, he later claimed that the transfers from the 919 Account to THL were to pay for Paulina's expenses, two contentions that are difficult to reconcile.[51] Further

---

[50] JX 19, which summarizes transactions for the 955 Account, begins on November 6, 2009 and concludes on January 9, 2012. JX 20, which summarizes transactions for the 919 Account, begins on January 8, 2010 and concludes on December 28, 2011.

[51] *Compare* Tr. at 95 (Kem testifying THL's payment of Paulina's expenses "would go in the books as basically a reduction of the money she had contributed") *with* Kem Post-Trial Aff. ¶ 7 (explaining that "money would flow between the '919 account and the THL account to cover Mrs. Dean's living expenses" to relieve Mrs. Dean of the obligation of writing her own checks, but "at no point did these transactions intend [sic] to reduce the amount owed by THL to Mrs. Dean.").

14

confusing matters, Kem's post-trial affidavit asserts that $1.5 million in transfers from the 919 Account to the 955 Account between 2004 and 2009 were for payment of Paulina's expenses, including expenses he previously testified were paid through THL.[52] Kem's post-trial affidavit also states that Paulina initially invested $2.7 million in THL in December 2004, but both the timing and amount of that figure contradict previous representations to Dean and an analysis of Paulina's investment in THL prepared by an accountant in 2012.[53] The bank statements and summaries Kem prepared also identify numerous transfers to Kem's personal accounts, with no further explanation for those transfers and no documentary support.

None of this is intended to conclude that Kem misappropriated or mishandled Paulina's funds. Although Dean's post-trial briefs repeatedly strayed into arguments about whether Kem had acted in accordance with his fiduciary duties as Paulina's agent,[54] at argument counsel conceded that the only thing before the Court at this time is whether Kem is required to account for the transactions he undertook on Paulina's behalf. Although Dean may elect to challenge certain transactions in either a separate action or a later iteration of this case, any such challenge is premature before an accounting is

---

[52] *Compare* Tr. at 94-95 (Kem testifying THL paid Paulina's monthly expenses like utilities and payroll) *with* Kem Post-Trial Aff. ¶ 1(j) (describing $1.5 million in transfers between Paulina's accounts as monthly expenses of approximately $30,000 a month for, among other things, payroll and utilities).

[53] *See* JX 4 and Kem Post-Trial Aff. Ex. D p. 6-8.

[54] *See, e.g.* Dean Opening Br. at 17-22. Among the issues raised for the first time in Dean's opening post-trial brief was his contention that the initial funding of THL was improper and should be reversed by this Court at this time. Kem contends the funding of THL is not properly before the Court. I agree, and Dean's counsel seemed to concede as much at post-trial argument.

performed. The Act does not limit this Court's authority to order an accounting to cases in which a breach of fiduciary duty has been established.[55]

Under the circumstances of this case, particularly the amount of money at issue, the time frame involved, and the parties' continued disputes regarding Kem's actions under the Power of Attorney, a formal accounting conducted by a third party is appropriate, and I recommend that the Court enter an order providing for a forensic accounting of the transactions at issue. At least initially, the cost of that accounting should be borne by Paulina's estate, without prejudice to a later request to shift the costs in the event Dean successfully challenges Kem's conduct as Paulina's attorney-in-fact. The parties should attempt to select a mutually agreeable, independent accountant to perform this function.

## II. DEAN IS ENTITLED TO REIMBURSEMENT OF EDUCATIONAL EXPENSES CONSISTENT WITH HIS MOTHER'S PAST PATTERN OF GIVING.

The parties' other dispute centers on Paulina's practice of paying her grandchildren's educational expenses, the limits – if any – to that practice, and the extent to which Dean is entitled to reimbursement from Paulina's estate for educational expenses he paid for his children. Ultimately, the parties ask this Court to define Paulina's "past pattern of giving" as it relates to her grandchildren's education, a task made more difficult by the fact that there is minimal evidence, whether direct or otherwise, defining Paulina's pattern, largely because she provided very little guidance regarding the parameters of this gifting and the parties have not followed a wholly

---

[55] 12 *Del. C.* § 49A-116(a)(3).

consistent practice in requesting reimbursement or payment. Any *ex post* definition this Court can provide is little more than rough justice.[56]

Dean argues that Paulina never articulated any limits to her direction to her accountant that he should pay her grandchildren's educational expenses at Dean's or Kem's request, and that therefore there are no limits to Paulina's past pattern of giving. In essence, Dean urges that he and Kem are entitled to reimbursement for any expenses they classify as educational. Kem, on the other hand, argues that Dean's request for reimbursement is not consistent with Paulina's past pattern of giving because (1) the request is untimely, (2) Dean did not provide sufficient documentation to support his request, and (3) Dean seeks reimbursement for expenses that are not strictly educational expenses. Kem also argues that Dean waived his right to seek reimbursement between 2001 and 2009 by intentionally electing not to seek reimbursement during that period.

To the extent Kem criticizes Dean's reimbursement request as insufficiently documented and untimely, those criticisms come with ill-grace given Kem's almost complete failure to provide any documentation of the nature or timing of the educational expenses he paid from Paulina's accounts for his own children. Other than the period between 2004 and 2006 when he sought payment or reimbursement from Mr. Master, Kem concedes he regularly paid his children's educational expenses directly from

---

[56] "I give you my positions, Don't want no oppositions, It's rough justice, But you know I'll never break your heart." Mick Jagger and Keith Richards, *Rough Justice*, on A Bigger Bang (Virgin 2005).

Paulina's account or by transferring money from Paulina's account to his own account, and did not maintain any records regarding those payments.[57]

The parties agree that the unwavering practice, and the understanding in their family, was that Paulina would fund her grandchildren's education.[58] That understanding is consistent with the instructions Paulina gave her accountant, Mr. Master.[59] Those instructions never were withdrawn, and Paulina never questioned Kem's payments of his children's educational expenses from her account. Dean contends the Court therefore can conclude that Paulina intended to pay for all aspects of her grandchildren's education, including application fees, travel expenses, licensure, off campus room and board, and the like.

Although it is difficult to precisely define a pattern Paulina herself never endeavored to check, I believe Paulina's past pattern of giving – defined mostly by the parties' practices in seeking payment or reimbursement – was to pay expenses billed directly by an educational institution. That conclusion has two redeeming qualities: it is consistent with Dean's practice when he sought reimbursement from Mr. Master between 1987 and 2001, and it has the advantage of being easily verifiable and subject to less guesswork and dispute. Consistent with Paulina's generous nature, however, and her laissez faire attitude toward the payments, I believe that payment of all charges issued by an educational institution or program is consistent with Paulina's past pattern, even if those charges are not strictly tuition expenses. Therefore, and consistent with the type of

---

[57] Tr. at 67-69.
[58] *Id*. at 67, 135.
[59] Pre-Trial Order ¶ 2(h).

expenses Kem submitted to Mr. Master between 2004 and 2006, charges for room and board, books, activities, application fees, tutoring, and similar services should be paid or reimbursed, provided they are billed by a educational institution or program. As long as the program is educational, it makes no difference whether the institution was a trade school or vocational program, a review course or tutoring service, or whether the student obtained "credit" toward graduation, because Paulina never articulated any such limits. Conversely, expenses for off-campus living expenses and for travel would not fall within this pattern. Dean has not established that Paulina paid for those expenses in the past, or that the parties understood her instructions to extend to those attenuated expenses. My reasoning in this regard also turns in part on this category's susceptibility to further disputes: if the parties are entitled to reimbursement for a living expenses "allowance" they pay their children, it is safe to expect future disputes regarding the reasonableness of the amounts provided, and charges that one party inflated the amount of the allowance to improperly withdraw funds from Paulina's estate. In contrast, sums billed by an educational institution or program are less prone to criticism.

Having endeavored to define Paulina's past pattern of giving, the question remains whether Dean may seek reimbursement for such expenses from 2001 forward, despite having intentionally chosen not to seek such reimbursement in the past. Kem contends Dean waived his right to seek reimbursement between 2001 and 2009. Waiver is the "voluntary and intentional relinquishment of a known right."[60] To establish waiver, Kem

---

[60] *Aeroglobal Capital Mgmt. v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (quoting *Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982)).

must prove that Dean (1) knew all material facts relating to his right to reimbursement, and (2) intended to relinquish such rights voluntarily.[61]  Waiver may be express, or may be implied by conduct indicating an intent to abandon a known right, but either way the waiver must be "unequivocal."[62]  Dean unquestionably was aware that he could seek reimbursement for his children's educational expenses, as he did so consistently for a period of fourteen years.  When he stopped seeking payment or reimbursement in 2001, he candidly testified that he did so intentionally in an effort to distance himself from his past life and because he felt comfortable enough financially that he could pay the expenses himself.[63]  If Paulina's willingness to reimburse her grandchildren's educational expenses was a "right" subject to waiver, Dean's conscious decision and his testimony would be sufficient to establish a waiver.

As Dean correctly points out, however, cases in this Court and other courts addressing the doctrine of waiver consistently refer to the waiver of a "right," as opposed to a gift.[64]  In fact, the parties did not cite, and my independent research did not identify,

---

[61] *Prizm Grp., Inc. v. Anderson*, 2010 WL 1850792, at *6 (Del. Ch. May 10, 2010).

[62] *King v. VeriFone Holdings, Inc.*, 994 A.2d 354, 361 n. 21 (Del. Ch. 2010); *DiRienzo v. Steel Partners Holdings L.P.*, 2009 WL 4652944, at *4 (Del. Ch. Dec. 8, 2009).

[63] Tr. at 148.

[64] *See, e.g. Roam-Tel Partners v. AT&T Mobility Wireless Ops. Holdings, Inc.*, 2010 WL 5276991, at *9 (Del. Ch. Dec. 17, 2010) ("'Waiver is the voluntary and intentional relinquishment of a known right' either conferred by statute or secured by contract"); *Commercial Metals Co. v. Pan America Trade and Inv. Corp.*, 163 A.2d 264, 268 (Del. 1960) ("A wavier is an intentional relinquishment of a known right").  Although Kem identified cases discussing waiver as applying to a "requirement or condition," each such case addressed the waiver of statutory or contractual rights.  *See, e.g. Bantum v. New Castle County*, 21 A.3d 44, 51 (Del. 2011) (addressing waiver of statutory immunity); *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972) (discussing waiver of contractual rights); *Klein v. Am. Luggage Works*, 158 A.2d 814, 818 (Del. 1960) (finding no waiver of an alleged contractual right).  Kem also identified cases discussing waiver of a "privilege," but the use of "privilege" in

20

any case in which a court imposed a waiver defense against the recipient of a gratuitous gift, at least before the gift became a "right" the recipient was entitled to claim, such as in the case of a bequest or inheritance. Although Kem points to a secondary source describing waiver as "a voluntary and intentional relinquishment, surrender, or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed,"[65] the same source later identifies the existence of a right as an "essential element" to waiver, and clarifies that "[b]oth waiver and estoppel imply that the subject matter thereof is some legal right possessed at the time thereof by the person against whom it is asserted. Only a private right or privilege may be waived. … [A] waiver implies and requires the existence of the right in question at the time of the alleged waiver; there can be no waiver of a right before it exists, before a person is in a position to assert it, or after it has been lost."[66] There is no question that – had Paulina rescinded her offer to pay her grandchildren's educational expenses, neither of her sons could have enforced her gratuitous offer as a contractual right.

The conclusion that the doctrine of waiver does not apply in the case of an *inter vivos* gift stands to reason: there is no "condition or requirement" – as the Delaware cases sometimes describe the doctrine – or contractual or statutory right that Dean

those cases referred to constitutional or statutory privileges against, for example, self-incrimination or disclosure of attorney-client communications, rather than a gratuitous privilege conferred by a gift. *See, e.g. Barber v. Page*, 390 U.S. 719, 725 (1968) (analyzing waiver of constitutional right of criminal defendant to confront witnesses against him); *Tackett v. State Farm Fire & Cas. Ins.*, 653 A.2d 254, 259 (Del. 1995) (discussing waiver of attorney-client privilege).
[65] 31 C.J.S. Estoppel and Waiver § 85 (2014).
[66] *Id*. § 96.

consciously chose not to enforce. Rather, he elected for a period of time not to accept his mother's gift. Because there is no evidence that Paulina ever rescinded her offer, and no evidence that she conditioned her gift on a "timely" submission of reimbursement requests, Dean is entitled to the reimbursement he now seeks.

### III. AT THE PRESENT TIME, KEM IS ENTITLED TO PAY HIS ATTORNEYS' FEES FROM PAULINA'S ESTATE, SUBJECT TO DEAN'S RIGHT TO SEEK TO RECOUP THOSE FUNDS FOR THE ESTATE IN A LATER PROCEEDING

The parties also dispute whether Kem is entitled to pay his attorneys' fees from Paulina's estate, and whether Kem should be required to pay Dean's attorneys' fees himself, or through Paulina's estate. As to Kem's fees, an agent is entitled to reimbursement of expenses "reasonably incurred on behalf of the principal."[67] The fees and expenses related to this action fall into two categories: (1) those related to the question of Dean's right to reimbursement for educational expenses, and (2) those related to Dean's request for an accounting. Kem's decision to file this action to seek instructions from the Court regarding payment of educational expenses was reasonable in light of Dean's delay in seeking reimbursement and the uncertainty surrounding Paulina's pattern of giving. Although Kem had an interest in the outcome given his position as a beneficiary of Paulina's estate upon her death, his decision to file this action was not unreasonable, and in fact benefited Paulina's estate because it provided clarity regarding the proper scope of Paulina's gifting related to her grandchildren's education. Kem also paid from the estate his attorneys' fees relating to his defense of Dean's request for an

---

[67] 12 *Del. C.* § 49A-112(a).

accounting. At this point, the record is not sufficiently developed for the Court to determine whether Kem should reimburse the estate for his attorneys' fees associated with this portion of the proceeding. If Dean ultimately pursues claims against Kem arising from transactions covered by the accounting, Dean may argue at that time that Kem should reimburse the estate for legal expenses.

Similarly, Dean's argument that Kem engaged in bad faith conduct sufficient to justify deviating from the American Rule depends almost exclusively on Dean's argument that Kem breached his fiduciary duties to Paulina.[68] That issue will be determined at another time and on a more complete record. Similarly, Dean's argument that he conferred a benefit on the estate and should have a portion of his fees and costs paid by the estate is premature, and will be addressed if Dean ultimately succeeds in obtaining a judgment against Kem.

---

[68] *See* Dean Reply Br. at 13.

**CONCLUSION**

For the foregoing reasons, I recommend that the Court enter an order requiring Kem to submit to a forensic accounting for all transactions Kem conducted on Paulina's behalf after the Power of Attorney was executed. I further recommend that the Court instruct Kem to reimburse Dean, or pay on Dean's behalf, educational expenses incurred after 2001, to the extent such expenses are consistent with the pattern of giving discussed above. This is my final report and exceptions may be taken in accordance with Rule 144.

Respectfully submitted,


/s/ *Abigail M. LeGrow*
Master in Chancery