# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KIERAN WALSH and FRANCIS DEVLIN, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | C.A. No. 2019-0419-KSJM |
| WHITE HOUSE POST PRODUCTIONS, LLC, CARBON VISUAL EFFECTS, LLC, and JOHN DOES 1-25, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 4, 2019
Date Decided: March 25, 2020

Joseph Andrews, LAW OFFICE OF JOSEPH ANDREWS, Dover, Delaware; Joseph K. Jones, Anand A. Kapasi, JONES, WOLF & KAPASI, LLC, New York, New York; *Counsel for Plaintiffs Kieran Walsh and Francis Devlin.*

S. Mark Hurd, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Antony S. Burt, Jin Yan, SCHIFF HARDIN LLP, Chicago, Illinois; *Counsel for Defendants White House Post Productions, LLC and Carbon Visual Effects, LLC.*

**McCORMICK, V.C.**

This dispute arises from a buyout provision in the LLC agreement of Defendant Carbon Visual Effects, LLC (the "Company"). The provision gives the Company the right to purchase a member's LLC units at a price determined by a contractual appraisal process once the member's employment with the Company ceases. The price-fixing process contemplates as many as three independent appraisals. The Company obtains the first appraisal, which the departing member can dispute by obtaining a second appraisal. If the results of the second appraisal are more than ten percent higher than the first, the two appraisers jointly select a third appraiser, whose determination is binding on the parties.

The plaintiffs were employees and members of the Company. In 2018, the Company elected not to renew the plaintiffs' service agreements. In anticipation of the plaintiffs' departure, the Company noticed its intent to purchase the plaintiffs' units. The Company kicked off the price-fixing process by providing the results of the first appraisal to the plaintiffs. In response, the plaintiffs requested information from the Company to provide to the second appraiser. The Company then informed the plaintiffs that it had changed its mind about buying the plaintiffs' units.

The plaintiffs viewed the Company's withdrawal as a breach of the buyout provision. They pressed on with the price-fixing process and obtained a second appraisal. Because the second appraisal was more than ten percent higher than the

first, the plaintiffs demanded appointment of a third appraiser. When the Company did not respond to the demand, the plaintiffs commenced this litigation seeking to force the Company to finish what it started. The plaintiffs assert claims against the Company and its majority member for breach of the buyout provision, breach of the implied covenant of good faith and fair dealing, and specific performance.

The defendants have moved to dismiss the complaint for failure to state a claim. They argue that the Company had the right to withdraw from the price-fixing process and is therefore not required to follow through with the third appraisal. The plaintiffs respond that the buyout provision was a form of option contract such that, under common law, the Company could not withdraw from the price-fixing process once it noticed its intent to purchase the plaintiffs' units. The plaintiffs alternatively argue that the implied covenant of good faith and fair dealing prohibits the Company from withdrawing from the price-fixing process. They further argue that specific performance is appropriate under either theory.

This decision holds that the buyout provision is a call option and that the Company could not withdraw from the price-fixing process after it exercised the option. Because it is reasonably conceivable that the Company exercised the option by noticing its intent to purchase the plaintiffs' units, the plaintiffs have stated a claim for breach of contract and specific performance, at least as to the

Company. The plaintiffs have failed to state a claim against the majority member, which had no obligations under the buyout provision.

## I. FACTUAL BACKGROUND

The background facts are drawn from the Complaint[1] and documents it incorporates by reference.

### A. The Parties

In April 2009, Plaintiffs Kieran Walsh and Francis Devlin ("Plaintiffs") and Defendant White House Post Productions, LLC ("White House") founded the Company (with White House, "Defendants"), a Delaware limited liability company. White House is the Company's majority unitholder.

### B. The Buyout Provision

In 2014, Plaintiffs and White House—through its managing partner, non-party David Brixton—signed the Company's now-operative Amended and Restated Limited Liability Operating Agreement dated January 28, 2014 (the "LLC Agreement").[2]

Section 9.2(e) of the LLC Agreement (the "Buyout Provision") grants the Company the right to buy a former employee's units at fair market value. It provides: "In the event a Member ceases to be employed by the Company for any

---

[1] C.A. No. 2019-0419-KSJM, Docket ("Dkt.") 1, Civil Action Compl. ("Compl.").

[2] Compl. Ex. B.

3

reason, the Company shall have the right to purchase such Member's Units, and such Member shall be obligated to sell such Units to the Company . . . ."[3]

If the Company invokes its buyout right, Section 9.2(e) further establishes an appraisal process for determining the units' fair market value:

> [T]he purchase price of that Member's Units will be determined by a qualified appraiser. The appraiser will be instructed to determine the fair market value of the Member Units. . . . If the departing member does not agree with the results of this first appraisal then he or she may, at their own cost, retain a second appraiser to determine the fair market value of the Member's Units. This second appraiser must be instructed to value the Company under the same conditions as [the first appraiser]. If the results of this second appraisal are within 10% of the results of the first appraisal, the fair market value of the Member's Units shall be calculated as the average of the two appraisal results. If the results of the second appraisal are more than 10% higher than the results of the Company's appraisal, the two appraisers shall jointly choose a third appraiser. This third appraiser must be instructed to value the Company under the same conditions as [the first appraiser]. The cost of this third appraisal shall be equally split by the Company and by the Member. The results of this third appraisal shall be binding on both parties.[4]

---

[3] *Id.* § 9.2(e).

[4] *Id.* The omitted text provides the following "conditions" for the first appraisal: "The valuation shall include a minority discount of 15% and an illiquidity discount of 35%. Furthermore, the appraiser will be instructed to incorporate the effects of any potential loss of business likely to occur following the departure of the departing Member and to exclude any increase in business likely to occur following the hiring of a new employee brought in to replace the departing Member." *Id.*

4

## C. The Buyout Process

In November 2018, Brixton informed Plaintiffs that the Company would not be renewing Plaintiffs' service agreements. Plaintiffs' employment at the Company ceased at the end of April 2019.

Anticipating Plaintiffs' departure, the Company presented Plaintiffs with a value for their units on November 9, 2018. The Company later obtained the first appraisal contemplated by the Buyout Provision and provided it to Plaintiffs on December 13, 2018 (the "December Notice").

On February 7, 2019, Plaintiffs informed Defendants that they would be obtaining the second appraisal contemplated in the Buyout Provision. On February 11, counsel for Plaintiffs notified Brixton and the White House Director of Finance, Joseph Ruble, that Plaintiffs had retained an appraiser. To facilitate the appraisal, Plaintiffs requested Company documents. Ruble responded on March 18, providing some but not all of the requested documents.

On March 29, 2019, Brixton emailed Plaintiffs: "We have reevaluated our needs and have decided not to exercise the Company's right to purchase your Member Units."[5]

---

[5] Dkt. 16, Defs.' Opening Br. in Supp. of Their Mot. to Dismiss ("Defs.' Opening Br.") Ex. 1, at 2. The Court may consider this email because the Complaint incorporates it by reference. Compl. ¶ 39; *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).

On April 19, 2019, Plaintiffs' counsel wrote to Brixton and Ruble, informing them that Plaintiffs' appraiser had valued the units at a sum that was more than ten percent higher than that in the Company's December Notice. Plaintiffs requested that the Company engage a third appraiser as contemplated by the Buyout Provision. Defendants did not respond.

**D.     This Litigation**

Plaintiffs commenced this litigation on June 5, 2019. The Complaint initially named up to twenty-five fictitious "John Doe" defendants, which Delaware law does not permit.[6] The Complaint also initially asserted six Counts, but Plaintiffs abandoned or withdrew three of those Counts.[7] Three Counts against the Company and White House remain:

- Breach of the LLC Agreement;

- Breach of the implied covenant of good faith and fair dealing; and

- Specific performance of the LLC Agreement.[8]

---

[6] *See Andreae v. Andreae*, 1992 WL 43924, at \*10 (Del. Ch. Mar. 5, 1992) (granting motion to strike "references to the 'John Doe' directors").

[7] In briefing, Plaintiffs abandoned Count II for breach of contract against both Defendants and Count III for breach of fiduciary duty against White House. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived." (citing *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993))); *see also* Dkt. 35, Oral Arg. on Defs.' Mot. to Dismiss ("Oral Arg. Tr.") at 51:20–24 (confirming at oral argument that Plaintiffs were withdrawing Count III). Then, at oral argument, Plaintiffs conceded that Count IV for "gross and oppressive abuse of discretion," if cognizable under Delaware law, is just a subset of the fiduciary duty claim that Plaintiffs had waived. *Id.* at 52:17–23. Counts II, III, and IV are therefore dismissed.

[8] The three remaining Counts are Counts I, VI, and V, respectively.

On July 9, 2017, Defendants filed a motion to dismiss the Complaint. The parties fully briefed the motion,[9] and the Court heard oral arguments on November 8, 2019.[10] At that hearing, the Court requested that the parties make supplemental submissions concerning Defendants' obligations under the LLC Agreement.[11] The Court received those supplemental submissions on December 4, 2019.[12]

## II.  LEGAL ANALYSIS

Defendants moved to dismiss each of the remaining three Counts pursuant to Court of Chancery Rule 12(b)(6). Under Rule 12(b)(6), the Court may grant a motion to dismiss if the complaint "fail[s] to state a claim upon which relief can be granted."[13] "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[14] When considering such a motion, the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the

---

[9] Defs.' Opening Br.; Dkt. 21, Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Answering Br."); Dkt. 27, Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss Pls.' Compl. ("Defs.' Reply Br.").

[10] Oral Arg. Tr.

[11] *Id.* at 61:22–62:20.

[12] Dkt. 31, Defs.' Suppl. Br. in Supp. of Their Mot. to Dismiss Pls.' Compl. ("Defs.' Suppl. Br."); Dkt. 32, Pls.' Suppl. Submission in Opp'n to Defs.' Mot. to Dismiss.

[13] Ct. Ch. R. 12(b)(6).

[14] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[15] The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[16]

Plaintiffs claim that Defendants breached either express or implied terms of the Buyout Provision by withdrawing from the price-fixing process and refusing to engage a third appraiser. Plaintiffs further seek specific performance of the Buyout Provision. This decision first addresses Plaintiffs' claims against the Company and then evaluates the claims against White House.

### A.    The Complaint States a Claim Against the Company.

Each of Plaintiffs' claims against the Company arises from the Buyout Provision. The parties' dispute primarily centers on the Buyout Provision's contractual appraisal process. When a price-fixing mechanism takes the form of a third-party appraisal, the party who has the right to select the appraiser has a clear advantage. "Since appraisal is not a science," the buyer may "select an appraiser more likely to report a lower value" on the one hand,[17] and the seller may "present a valuation from a professional appraiser that will be astronomically high" on the

---

[15] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[16] *Price v. E.I. du Pont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[17] Farhad Aghdami, Howard M. Zaritsky & Mary Ann Mancini, Structuring Buy-Sell Agreements ¶ 9.03[6] (2005).

other hand.[18] To reconcile these battling incentives, many drafters include provisions allowing the buyer and the seller each to select an appraiser.[19] Two appraisals requires a process for resolving potential disparities, such as the averaging of the two appraisals if they are within a reasonable range of one another or the appointment of a third appraiser.[20]

As discussed at the beginning of this decision, the Buyout Provision follows a version of this common "appraising triumvirate"[21] by establishing a sequence of up to three appraisals. The Company commences the process by retaining an appraiser to "determine the fair market value of the Member Units" and discount that value by certain specified percentages and risks.[22] Once the Company shares the first appraisal with the departing member, the departing member can either accept the price established by the first appraiser or dispute the price by retaining a second appraiser at the member's own cost.[23] What happens last depends on the result of the second appraisal. If the result is within ten percent of the first

---

[18] Kerry M. Lavelle, *Drafting Shareholder Agreements for the Closely-Held Business*, 4 DePaul Bus. L.J. 109, 123 (1991).

[19] Aghdami, Zaritsky & Mancini, *supra* note 17, at ¶ 9.03[6] ("[I]t is often deemed more equitable to give the buyer . . . and the seller each the right to select an appraiser . . . .").

[20] *See id.*; Suren Gomtsian, *Exit in Non-Listed Firms: When and How to Use Share Transfer Restrictions?*, 27 Eur. Bus. L. Rev. 719, 731 (2016) (describing common contractual appraisal processes).

[21] Aghdami, Zaritsky & Mancini, *supra* note 17, at ¶ 9.03[6].

[22] Compl. Ex. B § 9.02(e).

[23] *Id.*

appraisal, then the purchase price is the average of the two appraisal results. If the result is more than ten percent higher than the first, then "the two appraisers shall jointly choose a third appraiser"[24] whose determination will be "binding on both parties."[25]

In this case, the Company attempted to cut short the sequence of appraisals contemplated in the Buyout Provision after Plaintiffs stated their intent to obtain a second appraisal. Plaintiffs claim that the Company breached the Buyout Provision by first withdrawing from the price-fixing process and then failing to follow through with the third appraisal.

Nothing on the face of the Buyout Provision expressly prohibits the Company from withdrawing from the price-fixing process at any time before the "binding" third appraisal.[26] This analysis thus first addresses whether the common law or the implied covenant of good faith and fair dealing imposes this restriction.[27] The analysis then considers whether either theory supports the relief of specific performance.

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] 6 *Del. C.* § 18-1104 ("In any case no provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."); 6 *Del. C.* § 18-1101(c) ("[T]he limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.").

10

### 1. Breach of the Buyout Provision

The Company argues that the December Notice was an "offer" that the Company had the right to withdraw before Plaintiffs accepted. The Company further contends that because Plaintiffs never accepted the offer, the Company's withdrawal was timely.[28] Plaintiffs respond that the Company's argument fundamentally misconstrues the nature of the Buyout Provision. To Plaintiffs, the Buyout Provision is a "call option," or a form of option contract. Under common law principles concerning option contracts, Plaintiffs argue, the Company exercised its right to purchase Plaintiffs' units under the Buyout Provision when it issued the December Notice. In exercising that right, the Company created an enforceable agreement.[29]

Although it is true at common law that an offeror may revoke its offer before acceptance,[30] option contracts are an exception to this general rule.[31] "Defined at

---

[28] Defs.' Suppl. Br. at 8.

[29] Pls.' Answering Br. at 18.

[30] *Montray Realty Co. v. Arthurs*, 105 A. 183, 186 (Del. 1918) (observing that "[i]t is fundamental law that an offer may be revoked at any time before acceptance"); *see also* Restatement (Second) of Contracts § 36(1)(c) (explaining that an offeree's power of acceptance may be terminated by "revocation by the offeror"); *id.* § 42 ("An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract.").

[31] Restatement (Second) of Contracts § 25; 1 Farnsworth on Contracts § 3.28 (4th ed. Supp. 2019); 3 Corbin on Contracts § 11.1 (rev'd ed. 1996); 1 Williston on Contracts § 5:15 (4th ed. 1993).

11

its most basic level, an option is simply a contract to keep an offer open."[32]  An

option contract has two elements: the underlying offer concerning the sale or

purchase of the property and the collateral promise to hold that offer open.[33]  The

option holder, or offeree, holds the power of acceptance as to the underlying

offer.[34]  Option contracts can address a variety of transactions, but the most

common involve the sale of property.[35]  "Call options" are a species of option

contract that grant investors or the firm the right to purchase the interests of other

investors.[36]

---

[32] 1 Williston on Contracts § 5:15 (4th ed. 1993).

[33] *Id.* § 5:16 (4th ed. 1993) ("An option to purchase or sell is not itself the contract to purchase or sell," but "once the option is exercised . . . the *underlying agreement* becomes a valid and enforceable bilateral contract." (emphasis added)).  At common law, an offeror's promise to keep an offer open must be supported by consideration.  *See* 1 Farnsworth on Contracts § 3.28 (4th ed. Supp. 2019).  But "where the option is simply a subsidiary part of a larger transaction, . . . the consideration for the option is seldom a definitely determinable portion of what the option holder gives to the other party." 3 Corbin on Contracts § 11.7 (rev'd ed. 1996).  In that case, "[i]t is not necessary for either the parties or the court to make a separate valuation of the option in order that it should be enforceable."  *Id.*; *see also* 1 Farnsworth on Contracts § 3.28 (4th ed. Supp. 2019) ("A promise not to revoke an offer may also be supported by consideration other than money.  Thus an option may be part of a larger transaction . . . .").

[34] 3 Corbin on Contracts § 11.1 (rev'd ed. 1996); *see id.* § 11.8 ("The power of the option holder is generally called a power of acceptance . . . .").

[35] *Id.* § 11.1.

[36] *Id.* ("Options to buy and options to sell are illustrated by the transactions known in the markets . . . as 'puts' and 'calls.'"); Suren Gomtsian, *Private Ordering of Exit in Limited Liability Companies: Theory and Evidence from Business Organization Contracts*, 53 Am. Bus. L.J. 677, 707 (2016) ("A put option allows its holder to sell the holder's interest to the other investors in the firm (or to the firm) at the will of the holder or upon the occurrence of contingencies specified in the agreement.  A call option, on the contrary, is the right of the holder to buy the interests of the other members."); John M.

The Buyout Provision is a call option. It contains both elements of an option contract: an offer to enter into an underlying agreement for the sale of property and a promise to keep that offer open.[37] The underlying agreement is the Company's "right to purchase" a member's units "[i]n the event [that] [m]ember ceases to be employed by the Company."[38] The collateral agreement is Plaintiffs' promise to keep that offer open: "such [m]ember shall be obligated to sell" his units to the Company.[39] In sum, when executing the LLC Agreement, the parties agreed that all of pre-negotiated buyout terms would bind the parties in the event the Company exercised its option. This is, in all practical effect, the way a call option operates.

Because the Buyout Provision is a call option, the Company could not withdraw from the price-fixing process after exercising that option. "Like any other offer, an option imposes no duty on the offeree. The offeree has unfettered discretion to either accept the offer or not."[40] "An offeree that accepts the offer is

---

Cunningham & Vernon R. Proctor, Drafting Delaware LLC Agreements § 14B.11[C] (2011) (defining a call option as "an option to require the dissociated member to sell the member's membership rights to the LLC or to the other members").

[37] It is also reasonably conceivable that the Buyout Provision meets the common law consideration requirement for option contracts, as it is included in a larger transactional document—the LLC Agreement. *See supra* note 33.

[38] Compl. Ex. B § 9.2(e).

[39] *Id.*

[40] 1 Farnsworth on Contracts § 3.28 (4th ed. Supp. 2019); *see also* 1 Williston on Contracts § 5:16 (4th ed. 1993) ("The traditional view regards an option as a unilateral contract which binds the optionee to do nothing, but grants him or her the right to accept

said to 'exercise' the option."[41]   "[O]nce the option is exercised and the offer accepted . . . , the underlying agreement becomes a valid and enforceable bilateral contract . . . ."[42]   "The notice of acceptance binds the acceptor (option holder) irrevocably."[43]

It is reasonably conceivable that the December Notice constituted an exercise of the Company's power of acceptance under the Buyout Provision.  The provision does not specify the method by which the Company is required to exercise its power of acceptance.  Under Delaware law, acceptance "may be made in words or other symbols of assent, or it may be implied from conduct."[44]  In this case, it is reasonable to infer acceptance from the Company's conduct—namely,

---

or reject the offer in accordance with its terms . . . .  Thus, the optionee has the open discretion to take or to leave the proposal." (citations omitted)).

[41] 1 Farnsworth on Contracts § 3.28 (4th ed. Supp. 2019); *see* 3 Corbin on Contracts § 11.8 (rev'd ed. 1996) (explaining that an option contract "is a contract before the option holder makes a choice and *exercises* the power" (emphasis added)).

[42] 1 Williston on Contracts § 5:16 (4th ed. 1993); *see also* 3 Corbin on Contracts § 11.14 (rev'd ed. 1996) (stating that "[t]he giving of notice makes the contract bilateral with reciprocal rights and power").

[43] 3 Corbin on Contracts § 11.14 (rev'd ed. 1996).

[44] Restatement (Second) of Contracts § 50 cmt. c; *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229–30 & n.144 (Del. 2018) ("[I]n applying th[e] objective test for determining whether the parties intended to be bound, the court reviews the evidence that the parties communicated to each other up until the time that the contract was signed— *i.e.*, their words and actions . . . ." (citing Restatement (Second) of Contracts § 50 cmt. c)); *see Black Horse Capital, LP v. Xstelos Hldgs, Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) ("Whether both of the parties manifested an intent to be bound 'is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent.'" (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986))).

14

commencing the price-fixing process by providing the results of the first appraisal to Plaintiffs.

This conclusion finds support in *In re Ryckman Creek Resources, LLC*, which illustrates the way common law principles operate in an analogous situation.[45] In that case, the parties disputed a section of an LLC agreement titled "Call Option" that gave the majority member the right to purchase the interests of a minority member upon issuance of a "Call Option Notice."[46] The provision's price-fixing mechanism required the majority member to pay the greater of a contractually established minimum or the fair market value as determined by an independent appraiser.[47] After the majority member issued the Call Option Notice, the minority member sued to enforce the contractual minimum.[48] In response, the majority member argued that the parties never achieved a "meeting of the minds" sufficient to give rise to an enforceable agreement because the Call Option Notice was a form of offer and not a form of acceptance.[49]

The court rejected the majority member's position in view of what it described as the true nature of the Call Option:

---

[45] 2018 WL 4178692 (Bankr. D. Del. Aug. 29, 2018).

[46] *Id.* at *2.

[47] *Id.*

[48] *Id.* at *3.

[49] *Id.* at *9. The majority member specifically argued that the notice constituted a "counter-offer" rather than an "acceptance" of the contractual minimum. *Id.*

15

> The Call Option is itself the "offer" to [the majority member]. The Call Option Notice is the "acceptance" by [the majority member] to initiate the valuation process. That the [minority member] responded to the [Call] Option Notice with a different view of what the valuation should be is not the defining factor here.[50]

The court further concluded that the "'heart' of the Call Option is the *process* for determining the price of the [minority interest]" and that the parties achieved a meeting of the minds on that issue when they executed the LLC agreement.[51] The court thus rejected the notion that withdrawal was permissible because the Call Option did not expressly prohibit it.[52] Ultimately, the Court held that, once the majority member exercised the Call Option by way of the Call Option Notice, it could not subsequently withdraw from the price-fixing process.[53]

There are obvious parallels between *Ryckman* and this case. In all material respects, the Buyout Provision is comparable to the Call Option and the December Notice is comparable to the Call Option Notice. In *Ryckman*, the court held that once the buyer exercised its right to purchase the minority interest by issuing the Call Option Notice, it was bound to proceed with the price-fixing process contemplated in the Call Option. Applying this reasoning here, once the Company issued the December Notice, the Company was bound to proceed with the price-

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

fixing process contemplated in the Buyout Provision. While *Ryckman* is not binding on this Court,[54] it is persuasive, and the similar provisions should be similarly enforced.

The Company advances a textual argument for why the Buyout Provision should not be treated as a call option. The Company observes that whereas the provision at issue in *Ryckman* was expressly titled a "Call Option," neither the title nor the text of the Buyout Provision contains the word "option."[55] By contrast, the Company points to a tag-along provision in the LLC Agreement expressly stating that certain members have the "option to sell" their units according to its terms.[56] In light of the tag-along provision, the Company asserts that "[h]ad the parties wanted [the Buyout Provision] to be an option, they would have expressly stated so."[57]

The Company does not cite to authority for the proposition that a call option need be identified expressly as an "option" for it to operate as such or use the term "option" for it to provide one. Common usage suggests that the opposite is true. In *Simon-Mills II, LLC v. Kan Am USA XVI Limited Partnership*, for example, this Court described a buy/sell provision in a joint venture agreement as creating a "call

---

[54] *Longford-Myers v. State*, 213 A.3d 556, 559 (Del. 2019).

[55] Compl. Ex. B § 9.2(e) (titled "Other Restrictions on Transfer").

[56] *Id.* § 9.3.

[57] Defs.' Suppl. Br. at 4.

17

right" that "functions as an option," despite the absence of language in the buy/sell provision expressly indicating as much.[58]

In the end, dismissal is appropriate on a Rule 12(b)(6) motion "if the defendants' interpretation is the only reasonable construction as a matter of law."[59] In this case, Plaintiffs' interpretation of the Buyout Provision is the only reasonable one. Accordingly, Plaintiffs have stated a claim for breach of the Buyout Provision.[60]

### 2.    Breach of the Implied Covenant

Plaintiffs alternatively claim that the Company breached the implied covenant of good faith and fair dealing by withdrawing from the price-fixing process. The implied covenant is "best understood as a way of implying terms in

---

[58] 2017 WL 1191061, at *5, *28–30 (Del. Ch. Mar. 30, 2017).

[59] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003).

[60] The Company also argues that cessation of Plaintiffs' employment was a condition precedent to the Company's right to purchase Plaintiffs' units under the Buyout Provision. Defs.' Suppl. Br. at 11. Because Plaintiffs' employment with the Company did not end before the Company issued the December Notice, the Company argues that the condition precedent was not satisfied and thus Plaintiffs cannot enforce the Buyout Provision. *Id.* at 12. This argument does not provide a ground for dismissing the Complaint, as the condition seems one that *Plaintiffs*, not the Company, were positioned to enforce or waive. Moreover, the Company dictated the timing of when it exercised its right under the Buyout Provision; thus, Plaintiffs could argue that various doctrines apply, such as quasi-estoppel or waiver. *Personnel Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008) (observing that quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken" (internal quotation marks omitted)); *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (observing that "contractual requirements or conditions may be waived" (quoting *Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972))).

18

the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[61]   It "'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly silent' concerning the matter at hand."[62]

This Court recognized that the implied covenant may prohibit a party to a contractual appraisal process from exerting pressure on the process to coerce a more favorable valuation in *Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*.[63]   And one could argue that the Company's attempt to withdraw from

---

[61] *Oxbow Carbon & Minerals Hldgs. v. Crestview-Oxbow Acq.*, *LLC*, 202 A.3d 482, 507 (Del. 2010) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).

[62] *Id.* (first quoting *Nationwide Emerging Managers, LLC v. Northpointe Hldgs. LLC*, 112 A.3d 878, 896 (Del. 2015); then quoting *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006)).

[63] 2013 WL 1955012, at *25, *39 (Del. Ch. May 13, 2013) (stating that "[i]f one of the parties to the contract takes action to taint the appraisal process . . . a court can of course protect the injured party [by] . . . determining that a party had breached the contract's implied covenant of good faith and fair dealing" and holding that a party breached the implied covenant by "improperly pressur[ing]" an appraiser to adjust the values downward by applying an increased discount rate); *see also PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1016 (Del. Ch. 2004) (holding that the implied covenant of good faith and fair dealing prohibited a limited partner from engaging in a "course of conduct . . . in bad faith and in knowing disregard of [the minority limited partner's] rights under the partnership agreement[]" that was "designed to exert economic coercion . . . to force [the minority limited partner] to settle for a sum far lower than [it was] entitled to receive" under the price-fixing mechanism in the relevant buy-sell provisions). *Cf. PECO Logistics, LLC v. Walnut Inv. P'rs, L.P.*, 2015 WL 9488249, at *11 (Del. Ch. Dec. 30, 2015) (acknowledging that "the Court may protect against conduct undertaken by a contractual party to taint or corrupt the contractually prescribed appraisal process [by] . . . determining whether a party breached the implied covenant" but holding that the plaintiff failed to state a claim for breach of the implied covenant).

the price-fixing process had a coercive effect comparable to the conduct at issue in *Senior Housing*. But the call-option nature of Buyout Provision addresses the conduct at issue in this case—the Company's ability to withdraw from the price-fixing process. There is thus no gap, no room, and no need for the implied covenant. Plaintiffs have therefore failed to state a claim for breach of the implied covenant of good faith and fair dealing.

### 3. Specific Performance

The Buyout Provision mandates that "[i]f the results of the second appraisal are more than 10% higher than the results of the Company's appraisal, the two appraisers *shall* jointly choose a third appraiser."[64] Plaintiffs seek specific performance of this language in the form of an order requiring the Company to "jointly appoint a third appraiser in conjunction with Plaintiff's valuation expert."[65] "A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of the equities tips in favor of the party seeking performance."[66]

The Company first argues that Plaintiffs are not entitled to specific performance because the Company has no obligation under the LLC Agreement to buy Plaintiffs' units. As discussed above, however, it is reasonably conceivable

---

[64] Compl. Ex. B § 9.2(e) (emphasis added).

[65] Compl. ¶ 99.

[66] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (citation omitted).

that the Company's December Notice constituted an exercise of the Company's power of acceptance under the Buyout Provision. If the December Notice constituted an exercise, then the plain language of the Buyout Provision requires the Company—through use of the word "shall"—to follow through with the price-fixing process. The Company's first argument thus fails.

The Company next argues that Plaintiffs are not ready or willing to abide by the Buyout Provision's mandate because Plaintiffs ask the Court not only to order the Company to appoint a third appraiser, but also to "direct[] the third appraiser to value the Units *without* the minority discount of 15% and an illiquidity discount of 35% on account of Defendant's gross and oppressive conduct aimed at harming the Plaintiffs."[67] The Company correctly points out that Plaintiffs' request is inconsistent with the plain language of the Buyout Provision, which requires that any valuation "include a minority discount of 15% and an illiquidity discount of 35%."[68]

While Plaintiffs' request to eliminate the discounts required by the Buyout Provision is a reach, it does not demonstrate that Plaintiffs are unwilling to abide by the Buyout Provision. It is reasonably conceivable that Plaintiffs invoked the price-fixing process by retaining a second appraiser to value their units in response

---

[67] Compl. ¶ 100.

[68] Compl. Ex. B § 9.2(e).

to the Company's December Notice. That process resulted in an appraisal that was ten percent higher than that of the Company, which triggered the contractual obligation to cause the two appraisers to jointly select a third. And nothing in the Complaint indicates that Plaintiffs are unwilling or unable to fulfill that obligation. In fact, they have filed this lawsuit specifically for that purpose.

Defendants last argue that the balance of the equities does not weigh in favor of specific performance because, even if the Company does not purchase Plaintiffs' units pursuant to the December Notice, Plaintiffs "continue to hold their [u]nits and are entitled to receive payment for the value of those Units in the event [the Company] is sold or the [C]ompany elects to buy Plaintiffs' out in the future."[69] This argument again ignores the option contract theory that Plaintiffs have persuasively presented, under which the Company was bound to proceed with the appraisal process outlined in the Buyout Provision. Plaintiffs have therefore stated a claim for specific performance.

## B. The Complaint Fails to State a Claim Against White House.

The claims against White House are dismissed. Although White House is a party to the LLC Agreement, White House had no contractual rights or obligations under the Buyout Provision. The Buyout Provision states that "*the Company* shall

---

[69] Defs.' Reply Br. at 14.

have the right"[70] to purchase members' units, and the LLC Agreement's preamble defines "the Company" as Carbon Visual Effects, LLC.[71] Because White House had no contractual right or obligation under the Buyout Provision to purchase Plaintiffs' units, White House could not have breached the Buyout Provision by failing to do so. Put differently, Plaintiffs cannot obtain relief against White House for breaching obligations it does not have.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to White House Post Productions, LLC, "John Does 1 – 25," and Counts II, III, and IV. The motion is GRANTED as to Count VI against Carbon Visual Effects, LLC. The motion is DENIED as to Counts I and V against Carbon Visual Effects, LLC.

---

[70] Compl. Ex. B § 9.2(e) (emphasis added).

[71] *Id.* at 1.